JOURNAL ENTRY AND OPINION
The appeal and cross-appeal arise out of a business dispute between a service company and one of its former employees, a corporation created by the employee to compete with his former employer, and a salesman for the new corporation. For simplicity, the parties shall be referred to by their proper names.
Kenneth Majcen Associates dba Phoenix Group EAP, Inc. ("Phoenix Group") filed this action against its former employee, Andre Marmen, the new corporation, The Phoenix Associates, Inc. ("PAI"), and the salesman, Dennis Stevenson.[1] Phoenix Group is engaged in the business of providing employee assistance program ("EAP") services to employees of its client corporations. EAP services include counseling and related services. Defendants ultimately established a competing business and sold EAP and other services to what were or had been Phoenix Group clients. The parties disputed whether defendants breached any legal duty or engaged in any form of unfair competition.
Within days of Marmen's resignation as Executive Vice President of Phoenix Group, Phoenix Group commenced this action by filing a complaint for injunction, conversion, breach of his duty of loyalty, and violation of the Ohio Deceptive Trade Practices act. Phoenix Group filed an amended complaint within two weeks of its original complaint and three days before the hearing scheduled on its request for preliminary injunction. Phoenix Group alleged generally that defendants improperly obtained and used its confidential information, interfered with its contracts and clients, and established a "copy-cat" business with a similar name, Phoenix Associates, Inc. ("PAI") and with an identical corporate logo of a phoenix rising from a fire, to deceptively compete with it.
Marmen, PAI, and its successor, Icarus Group, filed a counterclaim and third-party complaint against Phoenix Group and its owner, Phillip S. Wenk. They alleged Phoenix Group agreed to permit them to solicit its clients for non-EAP services, such as executive searches, while Marmen was employed by Phoenix Group. They argued they did nothing wrong when they began competing with Phoenix Group by providing EAP services after Marmen terminated his employment with Phoenix Group.
Marmen was hired by Phoenix Group in 1993 to perform day-to-day management and sales activities pursuant to a written Employment Agreement for a one-year term. The Employment Agreement contained provisions prohibiting Marmen in perpetuity from using confidential information of Phoenix Group and from engaging in competition with Phoenix Group for a period of two years following the termination of his employment. (Employment Agreement, Ex. 40 at Paras. 7(a), 7(c) and 7(d).)
In 1995, while employed by Phoenix Group, Marmen incorporated the similarly named corporation, Phoenix Associates, Inc ("PAI"). He drafted a business plan for PAI which included income projections from providing services to Phoenix Group's existing clients "[b]ased upon [his] impressions of which companies will come with us." (Ex. 50.) The memorandum proposed to discuss the plan with other Phoenix Group employees at a party at his house. He held the party, but apparently did not discuss the plan with them at that time.
The owners of Phoenix Group underwent a divorce. Joan Wenk, the principal owner, had some involvement with Marmen in its operations and was dissatisfied. She also operated a day care center. Philip S. Wenk, her husband, was to receive the Phoenix Group as part of the divorce property division. Although he had two accounting degrees, he had been in a coma, suffered brain damage, and never fully recovered. Phoenix Group and Marmen exchanged draft contract documents in February 1996, but ultimately disputed whether Marmen entered into a new employment contract with Phoenix Group before the transfer and whether such contract contained or omitted the same confidentiality and competition restrictions as his prior 1993 contract.
Sometime during this period before August 1996, Marmen prepared a memorandum outlining a plan for PAI to take Phoenix Group's clients. The memorandum provides:
 As individuals, we have developed extremely close business relationships with most of our client companies. I am confident, therefore, that we can lure some of them away.
 I am hopeful that most of our existing clients will come with us. I am reasonably confident that those potential clients with whom Steve [Felber] has been working can be eased over to PAI as opposed to still signed [sic] with The Phoenix Group.
(Ex. 56.) The memorandum continued with a typewritten name and address list of thirty-eight Phoenix Group clients, in addition to one handwritten client name which was inserted and crossed off the list.
Approximately one year later, the business suffered some reversals. Phoenix Group lost a large client in November 1997 and its largest client in March 1998. Marmen proposed financial cutbacks. He deferred receipt of one-half his salary and various expenses, and the company terminated the employment of one counselor. Despite initially agreeing to defer one-half of his salary, the owner, Phillip S. Wenk, continued to receive the entire amount. Marmen was dissatisfied with his income deferral, with Wenk's retention of his salary and a company car, and Marmen's increased workload managing the finances.
In December 1997 and February 1998, Marmen met with Stevenson, an old friend. Although the exact terms of their agreement are unclear, Stevenson agreed to join Marmen beginning in April 1998. Marmen had proposed a plan to Wenk to sell non-EAP services to Phoenix Group's existing clients and share the resulting profits with Wenk, but had never told Wenk about the PAI corporation. On April 29, 1998, Wenk executed a one-sentence agreement drafted by Marmen "grant[ing] permission to Andre P. Marmen to offer and market non-EAP services to current Phoenix Group clients."[2] Marmen rented a single office in Phoenix Group's Solon offices from which to conduct this activity. Stevenson, who was retired and had some prior experience with executive recruiting, worked out of this office and began soliciting clients.
The events during the sixth months from April 1998 until shortly after Marmen's October 28, 1998 resignation were disputed at trial. During this period Marmen obtained EAP service contract renewals for several existing Phoenix Group clients and new clients. Several Phoenix Group clients and prospective clients for EAP and other services were obtained by PAI. Marmen diverted funds by invoicing and directing payments to PAI from several Phoenix Group clients for services that had been rendered by Phoenix Group and should have been paid to Phoenix Group. PAI documents, manuals, and contracts were substantially identical and admittedly "patterned after" Phoenix Group documents and PAI listed three Phoenix Group offices and certain Phoenix Group employees as its own. The phoenix rising from the fire on PAI's corporate logo was identical to that used by Phoenix Group.
The situation progressively deteriorated. Marmen kept a computer log of his complaints, beginning in April 1998 around the time Stevenson began, in a document captioned "PHIL'S PEARL HARBOR FILE." Both Marmen and Stevenson tape recorded meetings with Wenk without informing him that they were doing so. As time progressed, the documented activities to obtain contracts for PAI became more numerous.
The parties discussed a possible sale of the Phoenix Group business at three meetings in the summer and fall of 1998. Stevenson and Wenk attended all three meetings, Marmen attended the last two of them in October 1998. At Stevenson's request, Wenk gave him financial statements for 1996 and 1997. Stevenson requested more financial information. Wenk originally proposed a price of $250,000, and the parties ultimately discussed a price as low as $80,000. Wenk apparently offered to give Marmen 50% ownership of Phoenix Group if Marmen stayed and Marmen wanted to buy the remaining share. Stevenson threatened to compete with Phoenix Group and take its clients if Wenk did not sell the company. Marmen argued that an oral agreement was reached, but no written agreement was ever executed. Wenk made a handwritten note on the final written proposal indicating that he did not agree to the sale. (Ex. 35.)
Marmen tendered his resignation as Executive Vice-President of the Phoenix Group on October 28, 1998, effective October 30, 1998. Phoenix Group changed the locks on its offices.[3] One client canceled its EAP service contract with Phoenix Group because one of its employees was unable to obtain emergency services that weekend. In November 1998, several Phoenix Group clients tendered notice to terminate their EAP service contracts and entered into new agreements with PAI. Marmen solicited some clients and submitted time records and expense reimbursement requests to the Phoenix Group for contacts made with some of these clients who signed EAP contracts with PAI.
The matter proceeded to a lengthy jury trial. The jury found in favor of Phoenix Group against PAI, its successor Icarus Group, and Marmen in the amount of $120,000 compensatory and $120,000 punitive damages. The jury also found them liable for Phoenix Group's attorney fees, which the trial court awarded in the amount of $68,130. The trial court granted a directed verdict in favor of Stevenson on the claims against him. Finally, the jury found in favor of Phoenix Group and its owner Phillip S. Wenk on the counterclaim and third-party complaint.
The trial court also permanently enjoined Marmen, PAI, and Icarus Group from doing business with Phoenix Group clients and potential clients who dealt with Marmen during his employment by Phoenix Group. Phoenix Group appeals from the directed verdict in favor of Stevenson. PAI, Icarus Group, and Marmen cross-appeal from the judgment against them in favor of Phoenix Group. Their brief on appeal concedes there was sufficient evidence for the jury to find that Marmen diverted funds from Phoenix Group to PAI and violated his duty of loyalty to Phoenix Group as specifically found by the jury in Interrogatory 1, brief at p. 21, but raises a number of other arguments.
Phoenix Group's first and second assignments of error follow:
 I. THE TRIAL COURT ERRONEOUSLY GRANTED A DIRECTED VERDICT IN FAVOR OF DEFENDANT DENNIS STEVENSON ON PLAINTIFF'S CLAIM FOR TORTIOUS INTERFERENCE WIT ECONOMIC AND CONTRACTUAL RELATIONS.
 II. THE TRIAL COURT ERRONEOUSLY GRANTED A DIRECTED VERDICT IN FAVOR OF DEFENDANT DENNIS STEVENSON ON PLAINTIFF-APPELLANT'S CLAIM FOR DECEPTIVE TRADE PRACTICES PURSUANT TO OHIO REVISED CODE SECTION 4165.02.
These assignments are well taken.
Phoenix Group argues the trial court improperly directed a verdict in favor of Stevenson. Phoenix Group argues that the evidence, and reasonable inferences therefrom, when viewed in a light most favorable to it, was sufficient to support its claims against Stevenson for tortious interference and for engaging in deceptive trade practices. For the reasons set forth below, we agree.
Civ.R. 50(A)(4) governs motions for directed verdict and provides as follows:
 When granted on the evidence. When a motion for a directed verdict has been properly made[4], and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue.
Such a determination presents a question of law, not of fact. In short, trial courts must submit claims to the jury if the plaintiff presents evidence on each element of the claims to establish a prima facie case.
Trial courts are required to view the evidence and inferences therefrom in the light most favorable to the claimant and commit reversible error by interpreting the evidence in defendant's favor and granting a directed verdict. Glover v. Boehm Pressed Steel Co. (1995), 122 Ohio App.3d 702,709-711. It is well established that when deciding a motion for directed verdict, it is essential that trial courts not make findings of fact, weigh the evidence, draw inferences from the evidence, or determine disputed facts in issue, lest they deny litigants their right to a jury trial.
After reviewing the totality of the evidence in accordance with this standard, we conclude that Phoenix Group presented sufficient evidence to raise questions of fact for the jury concerning its interference with contract and deceptive trade practice claims and that the trial court erred by directing a verdict on them in favor of Stevenson.
The record contains a compelling mosaic of evidence from which the jury concluded that Marmen and PAI committed these torts and from which the jury could have concluded that Stevenson, jointly with them and/or individually, also committed them as well. Phoenix Group presented evidence that Stevenson, by himself and without the presence of Marmen, began the negotiations to purchase the Phoenix Group, which process evolved into a "squeeze play."[5] Stevenson ultimately threatened that he and Marmen would pirate Phoenix Group's clients away if Wenk did not sell.
Two significant incidents highlight Stevenson's conduct. Stevenson admitted that when a Phoenix Group client, National Interstate, called the Phoenix Group offices, Stevenson answered the phone and that he "may" have told the company that Phoenix Group changed its telephone number and then gave the company PAI's telephone number instead. There was evidence, furthermore, that Stevenson, while with Marmen, also engaged in a "bait and switch" sale of an EAP service contract to Tyler Elevator by indicating they represented Phoenix Group to obtain the contract for PAI. When viewed in the light most favorable to Phoenix Group, the evidence presented was sufficient to raise a question of fact for the jury concerning whether Stevenson interfered with Phoenix Group contracts and/or committed deceptive trade practices.
When granting the directed verdict, the trial court suggested that Stevenson could not be liable for either claim because he was an "independent contractor." The court stated:
 He's an independent contractor. He came in after this after his friend left the fold.
This view is unpersuasive, however, for two reasons. There is nothing within the nature of either tort which precludes liability for persons who are characterized as "independent contractors."
The Second Restatement of Torts defines the related claims of intentional interference with business relations to encompass "[o]ne who intentionally and improperly interferes with the performance of a contract" or "another's prospective contractual relation." Restatement (Second) Torts, Sections 766, 766A, and 766B (1977). R.C. 4165.02
likewise applies to all persons regardless of status by specifying that "[a] person engages in a deceptive trade practice when" he undertakes conduct specified in the section. Nothing in these definitions exclude an independent contractor.
Such an exclusion, as suggested by the trial court, would dictate that unscrupulous persons could commit either tort with impunity simply by asserting that they were "independent contractors." Independent contractors, however, are personally liable for their own tortious conduct in the same manner as any other persons. Although Stevenson, or any one else, is free to pursue business as he sees fit, no one is free to intentionally and improperly interfere with another's business relations or to commit deceptive trade practices. The question is whether there is sufficient evidence that Stevenson committed either tort.[6]
 Interference with Contract
Defendants' main argument at trial concerning the interference with contract claim was that Phoenix Group had to show that defendants caused one of Phoenix Group's clients to breach its contract with Phoenix Group. See Restatement, Torts, Second Section 766. This argument, however, unduly circumscribes the tort. The tort of intentional interference with contract also occurs when the tortfeasor (1) prevents the plaintiff in this case, Phoenix Group — from performing its owncontract; Restatement, Torts, Second Section 766A, or (2) prevents it from entering into a prospective contract. Restatement, Torts, Second Section 766B; Fred Siegel Co., L.P.A. v. Arter Hadden (1999),85 Ohio St.3d 171, 178-179.
The Ohio Supreme Court in Siegel summarized the requirements for raising a prima facie case of tortious interference:
 The elements of the tort of tortious interference with contract are (1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) lack of justification, and (5) resulting damages. (Kenty v. Transamerica Premium Ins. Co. (1995), 72 Ohio St.3d 415, 650 N.E.2d 863, paragraph two of the syllabus, affirmed and followed.)
Id. at syllabus paragraph one (reversing summary judgment for the defendant on this claim). During the course of its discussion, theSiegel Court recognized the tort also extended to claims involving entry into prospective contracts. Id. at 178-179. See also BrooksideAmbulance, Inc. v. Walker Ambulance Service (1996), 112 Ohio App.3d 150,155-156 (adding the term "or business relationship" to the first three elements set forth in Siegel, and reversing a directed verdict for the defendant on this claim).
The trial court did not mention any of these elements when it granted a directed verdict. When viewed in the light most favorable to Phoenix Group, however, the record contains evidence to support each element in the case at bar to raise a question of fact for the jury. Phoenix Group had contracts or business relationships with its clients. Stevenson admitted he knew the identity of Phoenix Group's clients and saw the Phoenix Group document defining the scope of their EAP services.[7]
(Ex. 4.) On at least two occasions in the incidents with National Interstate and Tyler Elevator there is evidence that Stevenson acted for the specific purpose of interfering with client contracts or business relationships or with knowledge that interference was certain or substantially certain to occur. Restatement, Torts, Second, Section 766, comment j. Finally, reasonable jurors could find that neither incident was justified by principles of competition and that damage resulted by impairing Phoenix Group relationships with its clients.
This impairment also occurred when National Interstate, a Phoenix Group client, called Phoenix Group and Stevenson answered the phone. By misinforming the company that Phoenix Group changed its telephone number, and giving it the Phoenix Associates' telephone number, Stevenson interfered with Phoenix Group's performance of its contract with National Interstate. Norton v. Popper (June 19, 1990), Franklin App. No. 89AP-906, unreported, juris. mot. over., (1990), 55 Ohio St.3d 706, provides an example which recognizes, contrary to the trial court's ruling, that an independent contractor is liable for intentional interference with a contract by preventing the plaintiff from performing its own contracts. Stevenson's conduct literally interfered with the performance of the National Interstate contract and there is no evidence in the record to show how, when, or if the client overcame this impairment to obtain the benefit of its bargain with Phoenix Group.
Stevenson's conduct at Tyler Elevator interfered with Phoenix Group's entry into a prospective contractual relationship. The controller of Tyler Elevator testified that Marmen and Stevenson indicated they were representing Phoenix Group and sold him a Phoenix Group EAP service contract, but instead sent him a contract with PAI. This impaired Tyler Elevator's entry into a contract with Phoenix Group as he desired. He had specifically selected Phoenix Group as one of only two organizations from which to pursue an EAP contract. The record contains the following testimony:
 PLAINTIFF'S COUNSEL: And during that meeting, um, let me ask you this, how did they how did Mr. Marmen and Mr. Stevenson represent themselves?
A: Phoenix Group, representing Phoenix Group.
 Q: And during that can you tell the jury, if you would, what was told to you by Mr. Marmen and Mr. Stevenson during that meeting?
 A: They described the benefits and services we received from the Phoenix Group, our employees could expect to receive.
 Q: And did Mr. Stevenson and Mr. Marmen speak during that meeting?
A: Yes, they did.
 Q: And at any time during that meeting did they represent to you that they were associated with another company called The Phoenix Associates?
A: Not to my recollection.
Later, the following questioning continued:
 PLAINTIFF'S COUNSEL: And also during that meeting, Mr. — did Mr. Stevenson speak?
A: Yes, he did.
 Q: And did he talk about employee assistance program [EAP] services to you during that meeting?
 A: I believe he commented on things that Andy was discussing, yes.
When granting its directed verdict, the trial court stated there was no evidence that Stevenson made statements to the controller at Tyler Elevator. After reviewing this testimony, however, we conclude that the trial court did not view the evidence in the light most favorable to Phoenix Group and, thereby, as in Glover v. Boehm Press Steel Co, supra, committed reversible error. The testimony reveals that both Marmen and Stevenson presented themselves as representing Phoenix Group. During the sales pitch, Stevenson also made statements to the controller of Tyler Elevator concerning EAP service contracts. Under the circumstances, when all the evidence and reasonable inferences are viewed in the light most favorable to Phoenix Group, a jury could find that Stevenson interfered with Phoenix Group's entry into an EAP service contract with Tyler Elevator.[8]
 Deceptive Trade Practices
The trial court also improperly directed a verdict in favor of Stevenson on Phoenix Group's deceptive trade practice claims. Ohio courts construe the Ohio Deceptive Trade Practices Act, R.C. 4165.01 to 4165.04, consistent with authority under comparable federal statutes. E.g., Cesare v. Work (1987), 36 Ohio App.3d 26, 28. R.C. 4165.02 provides in part as follows:
Deceptive trade practices
 A person engages in deceptive trade practice when, in the course of his business, vocation, or occupation, he:
(A) Passes off goods or services as those of another;
 (B) Causes likelihood of confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services;
Under the circumstances, a jury could find that the incident at Tyler Elevator was a textbook example of passing off as defined in R.C.4165.02(A). The term passing off is analogous to the term palming off, which has been defined under the federal trade law as follows:
 Palming off occurs when a defendant attempts to bring about consumer confusion by causing consumers to purchase its products under the mistaken belief that they are in fact purchasing the plaintiff's goods.
Worthington Foods, Inc. v. Kellog Co. (S.D.Ohio 1990), 732 F. Supp. 1417,1431 (Emphasis added). When viewed in the light most favorable to Phoenix Group, the jury could reasonably find that Stevenson misrepresented his affiliation with Phoenix Group to cause Tyler Elevator to purchase PAI's services under the mistaken belief that PAI was Phoenix Group. Such conduct may also fall under R.C. 4165.02(B) by causing a likelihood of confusion or misunderstanding as to the source of services.
A jury could also conclude that Stevenson's conduct in stating that Phoenix Group changed its telephone number and in giving National Interstate PAI's phone number instead was prohibited by R.C. 4165.02(B). This court has already held that a single act of informing a potential customer that one's former business partner has gone out of business and that one is the successor causes sufficient likelihood of confusion or misunderstanding to constitute a deceptive trade practice. See Lapine v. Cleveland Business Show, Inc. (Mar. 27, 1986), Cuyahoga App. No. 50028, unreported at pp. 3-4.
While Stevenson's role was admittedly more limited than Marmen's, the above incidents, even when taken in isolation as the trial court sought to do, are sufficient to permit a reasonable jury to conclude that Stevenson personally interfered with Phoenix Group's contracts and committed deceptive trade practices. Cases frequently involve both of these claims arising from the same conduct. E.g., Akron-Canton Waste Oil v. Safety-Kleen (1992), 81 Ohio App.3d 591, 598-600.
Rather than granting a directed verdict in a close case, particularly after the presentation of a substantial quantity of evidence on fact-intensive claims, the trial court may submit an issue to the jury and subsequently review the matter again, by examining a transcript if necessary, on a subsequent motion for judgment notwithstanding the verdict. Such a procedure would obviate the need for retrial when, as in the case at bar, the evidence has already been presented in a lengthy trial and most of the case was properly submitted to the jury for resolution.
Accordingly, Phoenix Group's first and second assignments of error on appeal are well taken.
The first, second, and third assignments on cross-appeal relate to the claim of breach of contract as follows:
 I. THE TRIAL COURT ERRED IN INSTRUCTING THE JURY ON BREACH OF CONTRACT WHERE THERE WAS NO VALID WRITTEN CONTRACT OF EMPLOYMENT IN EFFECT BETWEEN PHOENIX GROUP EAP AND ANDRE MARMEN DURING THE TIME FRAME ENCOMPASSING THE LAWSUIT. THEREFORE ANDRE MARMEN WAS AN EMPLOYEE-AT-WILL.
 II. THE TRIAL COURT ERRED IN INSTRUCTING THE JURY ON BREACH OF CONTRACT WHEN IT WAS NOT A CAUSE OF ACTION ALLEGED IN PLAINTIFF'S COMPLAINT.
 III. THE TRIAL COURT ERRED IN INSTRUCTING THE JURY ON THE ISSUE OF WHETHER THE DEFENDANT BREACHED AN AGREEMENT NOT TO USE THE CONFIDENTIAL INFORMATION OF PHOENIX GROUP EAP WHEN THERE WAS NO VALID AGREEMENT IN PLACE BETWEEN PHOENIX GROUP AND ANDRE MARMEN AND PLAINTIFF HAD NOT ALLEGED OR PROVEN THAT THIS INFORMATION WARRANTED PROTECTION AS A TRADE SECRET.
These assignments lack merit.
Marmen argues that the trial court improperly instructed the jury on the issue of breach of contract. He contends that Phoenix Group did not specifically plead a breach of contract claim. Moreover, he maintains that when the term of his 1993 annual employment contract concluded in 1994 he became an at-will employee. He suggests that the restrictive covenants lapsed and there was insufficient evidence that he agreed to the identical covenants in his 1996 contract. As a result, he argues that Phoenix Group was required, but failed, to show that its customer lists and pricing information were trade secrets. We are unpersuaded by these arguments.
Phoenix Group's complaint was filed four days after Marmen's resignation. Within two weeks and three days before the hearing scheduled on its request for preliminary injunction, Phoenix Group filed an amended complaint. Paragraph three of its amended complaint referred both to his original Employment Agreement and to his 1996 Employment Agreement and alleged them to be identical. A copy of the signature page of the 1996 Employment Agreement and the entire 1994 Employment Agreement were attached to the complaint as exhibits pursuant to Civ.R. 10(D). Paragraphs four and five of the amended complaint set forth certain restrictions from the two Employment Agreements. The amended complaint alleged facts that Marmen breached restrictions in the Employment Agreements, but did not expressly use the terms breach of contract. Under liberal standards of notice pleading, the amended complaint sufficiently alleged breach of contract despite failing to explicitly use the words breach of contract. Brady v. K R Industries, Inc. dba Barton Bakery (Dec. 13, 1989), Hamilton App. No. C-880641, unreported at p. 2 n. 2.
In fact, Marmen's trial brief indicated, contrary to his argument on appeal, that one of the issues for trial was breach of contract. The second sentence of his trial brief, filed on the day of trial, states: The complaint was amended to include a claim for breach of contract and covenant not to compete. (Id. at p. 1.) The brief further argued the merits of the breach of contract claim at pp. 8-12. Marmen never raised an objection during trial concerning the admission of evidence to support the claims that he breached the restrictions.
Even if the amended complaint did not sufficiently allege breach of contract as Marmen argues, however, trial of the issue was governed by Civ.R. 15(B).[9] When issues not raised by the pleadings are tried by express or implied consent they are treated in all respects as if they had been raised by the pleadings. Failure to object to evidence on such an issue as in the case at bar constitutes implied consent to trial of the issue. As a result, Marmen's second assignment of error on cross-appeal lacks merit.
The first and third assignments of error on cross-appeal do not challenge the substance of the trial court's instructions, but instead challenge the sufficiency of the evidence to support its instructions on breach of contract and breach of the confidentiality restriction. Any claim concerning the sufficiency of the evidence to submit these matters to the jury should have been raised by requesting a directed verdict on these issues. Marmen and PAI have cited no authority that parties may use the procedure for objecting to jury instructions as a device to circumvent the procedure for challenging the sufficiency of the evidence.
Even if their challenge to the court's instructions were sufficient to raise these issues, however, the contentions lack merit. The record contains sufficient evidence to warrant submitting the breach of contract and confidentiality claims to the jury. Paragraph 7(a) of the Employment Agreement between Phoenix Group and Marmen, dated August 23, 1993 and signed by Marmen on January 5, 1994, contained a confidentiality provision which prohibited Marmen in perpetuity from using confidential information of the Phoenix Group. The confidentiality clause provides as follows:
 7. Obligations of Employee Upon Discharge/Termination. Upon termination of the Employee's employment hereunder, at any time and for any reason whatsoever, the Employee agrees that:
 (a) Employee will not at any time, either directly or indirectly, make known, divulge, reveal, furnish, make available or use any confidential information of the Corporation, whether gained during his employment or otherwise. Such confidential information shall include, but not be limited to, all matters relating to the Corporation's sales, administrative methods and procedures, service and working methods and procedures, and the Corporation's records, customer lists, contracts, price structures and any other trade information gained by Employee during the term of his employment.
(Ex. 40 at pp. 2-3; emphasis added.)
Although this Employment Agreement was not executed on the first day of Marmen's employment on August 23, 1993, the grant of a one-year term of employment to someone who would otherwise have been an at-will employee constitutes sufficient consideration to support the confidentiality restriction. The Ohio Supreme Court has recognized that an employer's agreement to terminate an at-will employee only for cause constitutes valid consideration. Rogers v. Runfola Assoc., Inc. (1991),57 Ohio St.3d 5, 7. Here, Phoenix Group granted even more than the employer in Runfola because it agreed to a specific one-year term of employment and not to discharge Marmen within that time, absent cause.[10]
Because the record was sufficient to demonstrate, at a minimum, that Marmen breached the confidentiality provision of his first Employment Agreement, the trial court properly instructed the jury on Phoenix Group's breach of contract claim. Marmen never disputed executing this first Employment Agreement. Because the first Employment Agreement was valid and prohibited him in perpetuity from using Phoenix Group's confidential information, Phoenix Group was not obligated to show that the information taken by Marmen and used in the new business constituted trade secrets. Ex. 3 specifically referred to the client list as confidential, and Phillip Wenk, Jr. testified that Phoenix Group protected against the use or disclosure of such information by placing it in locked cabinets and restricting employees' use of it.
Marmen's arguments concerning the alleged lapse of the non-compete clause and the alleged failure to execute a new Employment Agreement with similar restrictions in 1996 are irrelevant because Phoenix Group was not seeking to enforce the non-compete restrictions on this claim. Phoenix Group sought to enforce the confidentiality restriction in paragraph 7 of the prior 1993 Employment Agreement. This clause prohibited Marmen from using Phoenix Group's confidential information in perpetuity: the clause did not lapse, and did not require any subsequent agreement to be enforced.
Accordingly, the first, second, and third assignments of error on cross-appeal are overruled.
The fourth assignment of error on cross-appeal complains about the trial court's instruction on the recovery of damages as follows:
 THE TRIAL COURT ERRED IN INSTRUCTING THE JURY ON FUTURE DAMAGES WHEN THERE WAS NO CAUSE OF ACTION BEFORE THE JURY THAT WOULD WARRANT THE ALLOWANCE OF FUTURE DAMAGES.
This assignment lacks merit.
PAI and Marmen argue for the first time on appeal the trial court improperly instructed the jury that Phoenix Group could recover future damages. They argue that Phoenix Group did not prove its claim for breach of contract and, therefore, could not recover such damages. This argument lacks merit for three reasons.
First, Marmen and PAI did not raise this objection at trial and, therefore, waived any claim of error. Civ.R. 51(A). Second, because we rejected the arguments concerning the underlying breach of contract in the first three assignments of error on cross-appeal, we reject this derivative argument concerning the otherwise admittedly proper recovery of such damages for that breach. Finally, Phoenix Group was entitled to recover compensatory damages on its breach of contract and tort claims. See Brookside Ambulance, Inc. v. Walker Ambulance Service, supra at 157. Any lost profit arising as from defendant's conduct is among the recoverable items of damages. A review of the record reveals that the trial court used the term future damages to include such damages. See White v. Cornell (Jan. 4, 1991), Lucas App. No. L-89-345, unreported at p. 6.
Accordingly, the fourth assignment of error on cross-appeal is overruled.
The fifth and sixth assignments of error on cross-appeal follow:
 THE TRIAL COURT ERRED IN INSTRUCTING THE JURY ON VIOLATION OF THE OHIO DECEPTIVE TRADE PRACTICES ACT WHERE PLAINTIFFS HAD KNOWLEDGE OF AND ALLOWED DEFENDANT TO DO BUSINESS IN THE MANNER CLAIMED TO BE DECEPTIVE.
 THE TRIAL COURT ERRED IN INSTRUCTING THE JURY ON VIOLATION OF THE OHIO DECEPTIVE TRADE PRACTICES ACT WHERE THE PLAINTIFFS FAILED TO PROVE ANY ACTUAL DAMAGES.
These assignments lack merit.
PAI and Marmen argue for the first time on appeal that the trial court should not have instructed the jury concerning Phoenix Group's Deceptive Trade Practices Act claims. As in their challenge to the trial court's breach of contract instructions, they do not challenge the substance of the instructions, but instead contend that Phoenix Group did not present sufficient evidence to support the claims. These arguments lack merit for both procedural and substantive reasons.
First, as noted above under the first and third assignments of error on cross-appeal, the proper way to challenge the sufficiency of the evidence to support a claim is to make a motion for directed verdict. As in the context of Phoenix Group's breach of contract claims, however, the excerpted transcript likewise contains no directed verdict by Marmen or PAI on Phoenix Group's deceptive trade practices claims. Marmen and PAI did even less to preserve this claim of error, because they never even raised any objection to the trial court's deceptive trade practice instructions.
In any event, Marmen and PAI's arguments lack merit for the same reasons they lacked merit under the second assignment of error on appeal. Tyler Elevator was deceived to enter into a contract with Phoenix Associates when it believed that it was entering into a contract with Phoenix Group. See Worthington Foods, Inc. v. Kellog Co. supra at 1431. Marmen and PAI presented no evidence that Phillip S. Wenk authorized them to pass off their services as those of Phoenix Group. Wenk signed a one-sentence agreement drafted by Marmen grant[ing] permission to Andre P. Marmen to offer and market non-EAP services to current Phoenix Group clients. The permission was specifically limited to Marmen, and Marmen never informed Wenk that PAI corporation existed. The letter did not grant Marmen permission to sell EAP services for his own personal benefit or permission to do so under a confusingly similar name.
Finally, the fact that Tyler Elevator later canceled the contract it was deceived to sign with PAI and subsequently entered into a new contract with Phoenix Group does not mean that Phoenix Group did not suffer any damages from the deceptive trade practices. Such an incident undermines client relations. Moreover, other witnesses also testified that they were confused by the similar names, Phoenix Group and Phoenix Associates. Under the circumstances, there was sufficient evidence that Marmen and PAI caused confusion and likelihood of misunderstanding concerning identity to the detriment of Phoenix Group.
Accordingly, the fifth and sixth assignment of error on cross-appeal are overruled.
The final assignment of error on cross-appeal follows:
 VII. THE TRIAL COURT ERRED IN GRANTING A PERMANENT INJUNCTION AGAINST DEFENDANTS WITHOUT JUSTIFICATION AND WHICH IS OVERLY BROAD.
This assignment is well taken.
The final assignment of error on cross-appeal argues, in two paragraphs, that the trial court should not have issued a permanent injunction and that the injunction it issued was overbroad. The trial court's journal entry provides in part as follows:
 1. Defendants are permanently enjoined from contacting or doing business, directly or indirectly, with any customers served by Plaintiff from August 23, 1993 through October 28, 1998, and those potential customers who dealt with Andre P. Marmen while he was associated with Plaintiff.
In its one-paragraph response, Phoenix Group asserts the injunction was appropriate, but suggests if this Court concludes otherwise that the injunction should issue for what has previously been held to be a reasonable time (one year from the date of termination of Marmen's employment on October 31, 1998) and for a reasonable geographic area (Northeastern Ohio). (Brief at 22, citation omitted.)
Even if one were to conclude that the original two-year non-compete restrictions from Paragraphs 7(c) and 7(d) of Marmen's first Employment Agreement lapsed as he argues, Phoenix Group presented evidence that he signed a new Employment Agreement with the identical restrictions on February 9, 1996. As a result, he would have had an obligation not to compete effective on the date he resigned and we need not decide whether such an injunction was an appropriate remedy under any other theory.
We believe that the trial court erred, however, by imposing a perpetual and unlimited obligation not to compete. The Second District Court of Appeals stated as follows:
 We have found no cases upholding as reasonable a covenant not to compete unlimited as to both geography and time.
 It would take an extraordinary showing to establish that [such] an unlimited restriction * * * was reasonably necessary to protect the covenantee's legitimate business interests.
Cad Cam, Inc. v. Underwood (1987), 36 Ohio App.3d 90, 94. Under the circumstances, we modify the injunction granted by the trial court to the precise one-year period and area specified by Phoenix Group.
Accordingly, the seventh assignment of error on cross-appeal is sustained in part.
The judgment of the trial court directing a verdict in favor of Stevenson is reversed and remanded for further proceedings. The judgment on the jury verdict in favor of Phoenix Group against Marmen, PAI, and the Icarus Group is affirmed. Finally, the trial court's permanent injunction is modified as set forth above.
Judgment accordingly.
It is ordered that appellees and appellant shall share equally the costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Cuyahoga County Common Pleas Court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
LEO M. SPELLACY, J., CONCURS; MICHAEL J. CORRIGAN, J., CONCURS IN JUDGMENT ONLY AND DISSENTS IN PART (See Concurring and Dissenting Opinion).
[1] During the course of the proceedings, PAI ceased operations, began doing business under a different name which was also the same or similar to another name used by Phoenix Group, and was ultimately followed by a successor, Icarus Group.
[2] Marmen made an audio tape recording of a meeting with Wenk concerning permission to market non-EAP services. Exhibit N was played during the proceedings but was not transcribed for review on appeal.
[3] Many of the documents introduced into evidence at trial were obtained after the litigation commenced from the Phoenix Group computer used by Marmen during his employment.
[4] It is questionable whether Stevenson "properly made" his motion for directed verdict. It is well established that a defendant must raise such a motion at the end of the plaintiff's case and renew it at the conclusion of all the evidence. Chemical Bank of New York v. Neman
(1990), 52 Ohio St.3d 204. The record indicates Stevenson did not make a motion at the end of plaintiff's case. Phoenix Group rested subject to presentation of one additional witness. The excerpted transcript filed on appeal shows that Stevenson did not make a motion for directed verdict either when Phoenix Group rested or after it presented the additional witness. Instead, Stevenson made his motion for directed verdict at the conclusion of all the evidence.
[5] Phoenix Group's assets were being used to compete against it and revenue belonging to it was being diverted to weaken the company and force a sale. Stevenson himself received a commission for obtaining Anderson-Dubose as a Phoenix Group EAP client, but maintained at trial that he did not make the sale.
[6] The second reason that the trial court's argument is unpersuasive is that even if one's status as an independent contractor were relevant, there was conflicting evidence presented in the case at bar concerning whether Stevenson was an "independent contractor." As a result, resolving this issue concerning Stevenson's status was itself a question of fact for the jury and the trial court erred by directing a verdict on this basis.
It is undisputed that Stevenson used a business card which stated that he was an officer, Vice President, of PAI. Although Stevenson and Marmen repudiated the business cards at trial and asserted that Stevenson was an "independent contractor," rather than an officer of PAI, resolution of this conflict in this evidence was a matter for the jury, without independent weighing or credibility determinations by the trial court.
[7] There is also evidence, contrary to his testimony, that he offered and sold EAP contracts. In addition to the incident at Tyler Elevator discussed in the text, the employee benefits coordinator of Grinnell Fire Protection System testified that Stevenson offered EAP services to her. Marmen told Phoenix Group that Stevenson sold an EAP service contract to Anderson-Dubose so that Phoenix Group would pay him a commission.
[8] This is not the only instance of the trial court failing to view the evidence in the light most favorable to Phoenix Group. As set forth in n. 6 above, there was conflicting evidence concerning Stevenson's status, which the trial court improperly viewed in favor of Stevenson. Moreover, the trial court's statement that He [Stevenson] came in after this after his friend left the fold is not accurate. Accord Glover v. Boehm Pressed Steel Co., supra.Stevenson, Marmen, and Jonathan Hill all testified that Stevenson began in April 1998. It is undisputed that Marmen did not resign from Phoenix Group until six months later on October 26, 1998. Thus, Stevenson came in six months before his friend Marmen left.
[9] Civ.R. 15(B) provides as follows:
 (B) Amendments to conform to the evidence. When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment. Failure to amend as provided herein does not affect the result of the trial of these issues. If evidence is objected to at trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice him in maintaining his action or defense upon the merits. The court may grant a continuance to enable the objecting party to meet such evidence.
[10] Other courts have held that even less consideration, for example continued employment as an at-will employee, is sufficient to support a restrictive covenant signed in the midst of employment by an at-will employee. Willis Refrig., Air Cond. Heating, Inc. v. Maynard (Jan. 18, 2000), Clermont App. No. CA 99-05-047, unreported; Canter v. Tucker (1996), 110 Ohio App.3d 421; Copeco, Inc. v. Caley (1992),91 Ohio App.3d 474.