Chemical Bank of New York, Appellee, *v.* Neman, Appellant.

[Cite as Chemical Bank of New York *v.* Neman (1990), 52 Ohio St. 3d 204.]

(No. 89-1111—Submitted May 8, 1990—Decided July 3, 1990.)

*Weick, Gibson & Lowry, Michael J. Moran, Leslie S. Graske* and *Kenneth L. Gibson,* for appellee.

*Scanlon & Gearinger Co., L.P.A., Mark Hilkert, Terence E. Scanlon* and *C. Donald Morris,* for appellant.

H. BROWN, J. Appellant, Neman, attacks the verdict against him on two grounds, both relating to the quantity and quality of the evidence against him. Neman claims that the trial court erroneously failed to direct a verdict in his favor. We find that this issue was not properly raised on appeal. Neman also contends that the record contains insufficient evidence to support the verdict. We find that the record contains sufficient evidence to support the verdict, and affirm the judgment of the court below.

## I
## Appeal From the Denial of the Directed Verdict

At the close of Chemical Bank's case in chief, Neman moved for a directed verdict on several grounds. The court denied this motion. Neman did not renew the motion at the close of all evidence.

Following the verdict, Neman moved for judgment notwithstanding the verdict ("JNOV") and for a new trial, making some of the same arguments which he used in support of his directed verdict motion. This motion, too, was denied.

Neman's notice of appeal recited that he was appealing "from the final judgment entered in this action * * * and from the judgment overruling defendant's motions for new trial or for judgment notwithstanding the ver-

dict * * * ." In his brief to the court of appeals, Neman raised four assignments of error: the first three were related to the denial of the directed verdict motion, the fourth was directed to the weight of the evidence. The brief did not mention the JNOV motion, and Chemical Bank's brief in opposition did not raise the issue of waiver.

The appellate court held that Neman's first three assignments of error were waived because he failed to renew his motion for directed verdict at the close of all evidence. Neman filed an application for reconsideration in which he asked that his assignments of error be construed so that they would refer to the JNOV motion instead of the directed verdict motion. This application was denied.

In the recent case of *Helmick* v. *Republic-Franklin Ins. Co.* (1988), 39 Ohio St. 3d 71, 529 N.E. 2d 464, we reaffirmed the long-standing rule that a motion for directed verdict which is denied at the close of the plaintiff's evidence must be renewed at the close of all evidence in order to preserve the error for appeal. See *Cincinnati Traction Co.* v. *Durack* (1908), 78 Ohio St. 243, 85 N.E. 38; *Zanesville* v. *Stotts* (1913), 88 Ohio St. 557, 106 N.E. 1051; *Youngstown & Suburban Ry. Co.* v. *Faulk* (1926), 114 Ohio St. 572, 151 N.E. 747. Neman acknowledges that this rule governs the instant case, but asks that we "modify" it and hold that his JNOV motion was equivalent to a renewal of the motion for directed verdict.

The record reveals that, though Neman raised some of the same issues in both motions, they are not identical. While Neman asserted at all stages of the proceeding that there was no proof of reliance or damages, his other arguments changed at each turn.[2] Fur-

---

[2] Neman's counsel made what amounted to six different arguments in support of the motion: (1) the bank presented no evidence that Neman made any false

ther, while the same standard is used to resolve both types of motion, see, e.g., *Cardinal* v. *Family Foot Care Centers, Inc.* (1987), 40 Ohio App. 3d 181, 532 N.E. 2d 162, a directed verdict motion made at the close of plaintiff's evidence is evaluated on the evidence in the plaintiff's case in chief, see *Helmick, supra,* at 73, 529 N.E. 2d at 466, while a JNOV motion is evaluated on all the evidence presented at trial. Thus, it is clear that an appeal from the ruling on a directed verdict motion and an appeal from the ruling on a JNOV motion are sufficiently different, both as a general proposition and on the specific facts before us, that one is not a substitute for the other.

Neman further contends that the court below should not have decided the case on the issue of waiver without allowing him an opportunity to argue the issue. Under App. R. 12(A), a court of appeals is not *required* to consider issues not argued in the briefs; however, App. R. 12(A) does not *prohibit* it from doing so in the exercise of its sound discretion. *Toledo's Great Eastern Shoppers City, Inc.* v. *Abde's Black Angus Steak House No. III, Inc.* (1986), 24 Ohio St. 3d 198, 202-203, 24 OBR 426, 429-430, 494 N.E. 2d 1101, 1104-1105.

As noted, *Helmick* and its predecessors are controlling. Applying this authority to the case before us, it is clear that Neman waived any claim

of error in the denial of the directed verdict by failing to renew his motion at the close of all evidence. Accordingly, we find that the court below did not abuse its discretion in declining to offer the parties an opportunity to argue the waiver issue.

## II
## Weight and Sufficiency of Evidence

In his final proposition of law, Neman argues that the jury verdict is against the manifest weight of the evidence. Two members of the panel in the court below agreed with this contention. Section 3(B)(3), Article IV of the Ohio Constitution provides that "[n]o judgment resulting from a trial by jury shall be reversed on the weight of the evidence except by concurrence of all three judges hearing the cause." Because the third member of the panel did not agree, the verdict against Neman was affirmed.

This court is not required to determine the weight of evidence in civil matters, R.C. 2503.43, and ordinarily will not do so. *State, ex rel. Kobelt,* v. *Baker* (1940), 137 Ohio St. 337, 18 O.O. 521, 29 N.E. 2d 960. Accordingly, we will treat Neman's fifth proposition of law as an attack on the sufficiency of the evidence. Our standard of review is found in the syllabus of *C.E. Morris Co.* v. *Foley Construction Co.* (1978), 54 Ohio St. 2d 279, 8 O.O. 3d 261, 376 N.E. 2d 578: "Judgments supported

---

statement, (2) the bank presented no evidence of intent to mislead, (3) the bank did not show reliance on Neman's statement, (4) there was no proof of the value of the Eastgate Realty stock, (5) the bank failed to prove that it was the same Chemical Bank which obtained the judgment against Rottmayer, and (6) the bank failed to produce evidence of gross or malicious fraud sufficient to support an award of punitive damages.

In his JNOV motion, Neman argued: (1)

there was no proof of any misleading statement, (2) there was no proof of damages, and (3) the bank relied, not on any statement made by Neman, but on the statement of someone interpreting what Deputy Carrano wrote on the return of service.

In his assignments of error before the court of appeals, Neman argued that he was entitled to judgment in his favor because (1) there was no proof of fraud, (2) there was no proof of reliance, and (3) there was no proof of damages.

by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence."

In order to establish a claim of fraud, such as the bank asserts here, the plaintiff must show:

" '(a) a representation * * * of a fact,

" '(b) which is material to the transaction at hand,

" '(c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred,

" '(d) with the intent of misleading another into relying on it,

" '(e) justifiable reliance upon the representation or concealment, and

" '(f) a resulting injury proximately caused by the reliance.' " *Cohen* v. *Lamko, Inc.* (1984), 10 Ohio St. 3d 167, 169, 10 OBR 500, 502, 462 N.E. 2d 407, 409.

Neman attacks the verdict on three fronts: (1) there was no proof that he made any misleading statement, (2) the bank could not have justifiably relied on any statement he made, and (3) the damage award is not supportable because the Eastgate Realty stock, had it been attached by Chemical Bank, was worthless. We shall discuss these arguments in turn.

## A
### Evidence of Misleading Statement

At the debtor's examination of Rottmayer, Neman told Lichko (the bank's counsel) that he either had possession of the Eastgate Realty stock certificates or would be able to get them, and any attachment should be done through him.[3] On application of the bank, the court directed Deputy Carrano to Neman's office to levy on the stock.

The parties do not dispute that the attempted attachment was unsuccessful. They do, however, disagree on what Neman told Deputy Carrano. At trial, Neman claimed to have told Deputy Carrano that the stock was in his possession, but not physically present at the office. In a deposition (which was used at trial to impeach him), he claimed to have given Deputy Carrano no information at all.

Deputy Carrano had no recollection of Neman's exact words. However, he did note on the execution jacket that Neman told him "he did not have any of the Stock Certificates in his possession." Deputy Carrano testified that it was a routine practice for him, when serving a writ of execution, to make his official report in the form of notations on the execution jacket, and he described those notations as "my sworn statement." He further testified that if Neman had told him that he had the stock at another location, that fact would have been noted on the execution jacket.

It is clear from the answers to the interrogatories that the jury did not believe Neman's trial testimony.[4] Further, the evidence presented by the bank is sufficient to permit the jury to conclude that Neman told Deputy Carrano he did not have possession of the stock when he in fact did.

## B
### Reliance

Neman makes two related conten-

---

[3] Lichko testified: "Mr. Neman said, 'Don't subpoena' — 'Don't attach Mr. Rottmayer, we'll make an accommodation. Do it to me. Okay. I either have it and I can't remember specifically, but either I have the stock or I'll get the stock, but serve me.' "

[4] See interrogatory Nos. 1, 3 and 4 in fn. 1, *supra.*

tions on the issue of reliance. First, he claims that the evidence conclusively shows that the bank did not rely on his statements to Deputy Carrano. Lichko became aware, sometime after August 19 and before September 16, that Neman had told the bank's New York counsel that Neman did not have the stock. On September 23, Lichko filed a praecipe for service of a writ of execution on Rottmayer. Apparently, because the execution jacket carries a handwritten notation which reads, "Writ returned 10/28/80 Bg.," Neman argues that the bank was not relying on Deputy Carrano's notations on the return of service because "[t]he deputy filed his return on October 31 [sic], 1980."

This argument ignores other testimony in the record. Deputy Carrano said that he returned the execution jacket to the clerk of courts on August 19, and did not make the "10/28/80" notation.[5] Further, Lichko testified that he learned that Neman claimed not to have the stock "at some point contemporaneous with this serving of this original writ, sometime around — after August 19, and I can't tell you if it was the 20th or 21st or if it was the 27th or whether it was September 1st * * *." Based on this testimony, the jury could have found that Deputy Carrano promptly filed the execution jacket, and that the results of his visit to Neman's office were communicated to Lichko shortly thereafter. Thus, the record can support a finding that the bank relied on Deputy Carrano's notations on the execution jacket.

Second, Neman cites *Mitchell* v. *Whitaker* (1986), 33 Ohio App. 3d 170, 172, 514 N.E. 2d 937, 939, for the proposition that "a litigant should not easily rely on an opponent's failure to clarify or disclose facts in adversarial litigation." This argument is related to his contention that the bank was actually relying on his statements to its New York counsel.

Neman was clearly under no duty, as Rottmayer's attorney, to disclose the whereabouts of the stock to Chemical Bank. However, having offered to supply this information, he could not then mislead the bank in the guise of "zealous representation." See EC 7-10 of the Code of Professional Responsibility ("The duty of a lawyer to represent his client with zeal does not militate against his concurrent obligation to treat with consideration all persons involved in the legal process and to avoid the infliction of needless harm."). Thus the statement to New York counsel could support an action for fraudulent misrepresentation.

However, the jury specifically found that the bank relied on Neman's statements to Deputy Carrano. As noted *supra,* there is sufficient evidence in the record to support this finding. Thus, the bank was relying on more than "an opponent's failure to clarify or disclose facts in adversarial litigation." Neman's statement that he did not have possession of the stock was made to an agent of the court, Deputy Carrano, in response to an official act, the service of the writ of execution. Whether or not an adversary, one should be able to rely upon statements of an attorney to an officer of the court engaged in official business.

## C
### Damages

Neman's final contention is that

---

[5] The "10/28/80" notation is in different handwriting than Deputy Carrano's, and concludes with the initials "Bg." It would appear that it was made by another court employee, possibly in the course of filing the jacket.

Chemical Bank failed to prove actual damages resulting from its inability to attach the Eastgate Realty stock on August 19, 1980.

Chemical Bank presented evidence of the fair market value of Eastgate Shopping Center, which constituted Eastgate Realty's primary asset. The bank introduced into evidence the bankruptcy petitions filed by Neman in 1982 on behalf of Rottmayer and Eastgate Realty. Rottmayer's petition lists the value of the Eastgate Realty stock as $3,900,000. While this figure seems high, and is inconsistent with the values given in Eastgate Realty's petition, it does support the verdict.

Further, Eastgate Realty's bankruptcy petition lists the fair market value of the shopping center as either $2,300,000 or $3,900,000. The schedule of creditors lists two mortgage liens of ''$847,120.04 + '' and ''$200,000.00 + '', and unpaid real estate taxes of $101,996.88. According to these figures, the shopping center had a net fair market value *in 1982* of between $1,150,000 and $2,750,000.

Al Spalding, a senior real estate analyst, testified that the shopping center was worth between $1,560,000 and $2,000,000 in August 1980. In arriving at this figure, Spalding first determined the reasonable market rental income the property could generate under proper management,[6] then deducted expenses. This gave a net income figure which was multiplied by a "capitalization rate" to yield a final fair market value. Subtracting the lien amounts given in the bankruptcy petition from these figures yields a net fair market value of between $410,000 and $850,000.[7]

Despite this evidence, Neman argues that the Eastgate Realty stock was effectively worthless. He contends that if Chemical Bank had been able to attach the stock on August 19, 1980, it could not have obtained actual ownership of Eastgate Realty before the foreclosure actions were filed on September 26 and 29. The property could not, he argues, have been sold at foreclosure for more than the amount of the liens. Spalding, the analyst, noted that a "forced sale" such as a foreclosure sale would reduce the sale price by one third to one half.

Neman is correct in pointing out that Chemical Bank probably could not have obtained ownership of Eastgate Realty before the foreclosure actions were filed. However, this is not dispositive. Neman ignores the fact that filing a foreclosure action is not equal to foreclosure. A foreclosure action is a civil action in equity. See, *e.g., Union Trust Co.* v. *Lessovitz* (1930), 122 Ohio St. 406, 171 N.E. 849, paragraph one of the syllabus. As one commentator has noted:

''* * * It is complicated, costly, and time-consuming. A typical action in equity to foreclose and sell involves a long series of steps: a preliminary title search to determine all parties in interest; filing of the foreclosure * * * complaint * * *; service of process; a hearing * * *; the decree or judgment; notice of sale; actual sale and issuance of the certificate of sale; report of the sale; proceedings for determination of the right to any surplus; * * * and the

---

[6] Spalding testified that, in his opinion, Rottmayer's management of the center was "extremely poor," and that good management in prior years would have increased the 1983 sale price by twenty-five to thirty percent.

[7] This calculation somewhat undervalues the property because the lien amounts in the 1982 bankruptcy petition include the mortgage interest and back taxes which accrued between 1980 and 1982.

entry of a decree for a deficiency." Nelson & Whitman, Real Estate Finance Law (2 Ed. 1985) 506, Section 7.11.

At any time before the final decree, Eastgate Realty or the bank (as Eastgate Realty's new majority shareholder) could have redeemed the property by paying off the liens. Nelson & Whitman, *supra*, at 478-480, Sections 7.1-7.2. Indeed, it is customary for Ohio courts to allow a reasonable time for the mortgagor to redeem *after* the decree ordering a sale has been issued. See 69 Ohio Jurisprudence 3d (1986) 452, Mortgages and Deeds of Trust, Section 399. Thus, the commencement of a foreclosure action would not have rendered Chemical Bank's attachment of Eastgate Realty stock futile.

Neman's argument also requires us to assume that Chemical Bank could only have disposed of the property through a forced sale. This is not necessarily true. Once the liens on the property were discharged, Chemical Bank might have arranged for an orderly, non-distress sale of Eastgate Shopping Center. Alternatively, the bank might have decided to keep the shopping center.

It is not necessary for the jury, or for a reviewing court, to determine just how the bank might have managed its property. The significant issue relates to the evidence concerning the value of the Eastgate Realty stock at the time the bank's attachment was thwarted by Neman. On this issue, the jury's finding that Chemical Bank lost $972,500 due to the inability to attach Eastgate Realty stock[8] can be supported by the appraiser's testimony and by the bankruptcy petitions prepared by Neman himself.

III
Conclusion

Based on our review of the record, we hold that the court below properly found that appellant Neman waived any claim of error in the denial of his directed verdict motion by failing to renew the motion at the close of all the evidence. We further hold that the verdict is supported by "some competent, credible evidence going to all the essential elements of the case." The judgment of the court of appeals is therefore affirmed.

*Judgment affirmed.*

MOYER, C.J., SWEENEY, HOLMES, DOUGLAS, WRIGHT and RESNICK, JJ., concur.

---

[8] See interrogatory No. 9 in fn. 1, *supra*.