OPINION.
Defendant Jane Niehaus appeals from the judgment of the trial court entered upon a jury's verdict finding her jointly and severally liable as a partner in a real-estate investment company to plaintiff R. Randall Allen for fraud, and awarding Allen compensatory damages, punitive damages, and attorney fees. The fraud arose out of Allen's purchase of a house located at 638 Fleming Road. The house and the land it sat upon were subject to a landslide condition concealed and not disclosed to Allen by the sellers. While Jane Niehaus, as a trustee, was listed as the owner on the deed prior to the sale, the jury found that the house was actually owned by a partnership created by Niehaus and her co-defendant, Marinko Gvozdanovic.
Niehaus also appeals from the post-trial order of the trial court denying her motion for remittitur, calculating a setoff of damages, and awarding Allen prejudgment interest. Allen has filed a cross-appeal, citing certain alleged errors at trial in the event that he loses on appeal, and, in addition, citing as error the trial court's post-trial setoff of damages.
 THE FACTS
In 1992, Greg Gavin Homes built the house at 638 Fleming Road that is the subject of this appeal. The large, two-story, three-bedroom home with an in-ground swimming pool sold for $298,000. A short time after the original purchasers moved in, significant damage to the house, garages, and driveway occurred. An investigation by a geotechnical engineering firm, G.J. Thelen Associates ("Thelen"), disclosed that the house was built on a landslide. Thelen issued a twenty-three-page report ("Thelen Report") detailing the lateral and vertical earth movements affecting the property at 638 Fleming Road and the surrounding acreage. The report included alternative recommendations to remedy the problem.
After settling a claim against Gavin Homes, the original purchasers sold the property to Kraft Construction Company ("Kraft")[1] in 1993 for $90,000. At the same time, Kraft purchased an adjacent property, known as 622 Fleming Road, for $35,000. Prior to selling the property to Kraft, the original purchasers disclosed to Kraft the existing landslide condition and provided to Kraft a copy of the Thelen Report. The original purchasers also gave Kraft a proposal from another geotechnical engineering firm, Richard Goettle, Inc., ("Goettle") to stop the landslide at a stated cost.
After purchasing the property, Kraft obtained its own proposal from Goettle to stop the horizontal shift of the land for $99,000. Goettle proposed to furnish and install an earth-retention system using soldier piles and tie backs. This solution was designed to remedy the landslide. Kraft also obtained a proposal from a company called Hydra-Lift to stabilize the vertical settlement of the house at a cost of $8,800. Hydra-Lift proposed to lift the house and to install eleven steel piers under the foundation. This solution was designed to remedy the existing settlement of the foundation but would not control subsequent lateral shifting due to the landslide condition. Kraft never acted on the proposals, as its lender denied the necessary financing and Kraft was forced to sell the property.
Kraft advertised the property in the Cincinnati Enquirer as an investment property that "need[ed] added foundation supports." After seeing the advertisement, Gvozdanovic contacted Greg Hermes, one of the owners of Kraft, and was told the ownership history of the property, including the landslide condition. Gvozdanovic visited the property, and on May 23, 1994, he signed both a contract to purchase the property and Kraft Construction's R.C. 5302.30 property-disclosure form. The disclosure form referred to "[e]xisting landslide incorporating both properties w/engineered solution attached," and "[e]xisting settling of land at 638 and 622 Fleming Rd." The engineering solutions were the $99,000 Goettle proposal and the $8,800 Hydra-Lift proposal. Gvozdanovic reviewed the Goettle proposal, and, according to Hermes, he was informed of the existence of the Thelen Report but did not ask to see it. Gvozdanovic brought a carpenter and a masonry expert out to the property and, after drilling a hole into the retaining wall behind the driveway, determined that the cause of the slippage was the buildup of hydrostatic pressure behind the retaining wall.
Gvozdanovic then called Jane Niehaus to see if she would be interested in purchasing the property with him. Gvozdanovic and Niehaus had previously purchased, renovated and sold ten properties together, always splitting the expenses and profits evenly.
Niehaus toured the property with Gvozdanovic, and, according to Gvozdanovic, they discussed the contents of Kraft Construction's disclosure form while viewing the damaged property. At Niehaus's request, the defendants hired Tom Humphries ("Humphries"), a general contractor, to visually inspect the property. The defendants did not provide Humphries with the Goettle proposal but did inform him that there were structural problems. In his report, Humphries stated that the "property ha[d] severe structural problems" and "would be something you are going to purchase at your own risk." The report also included the following disclaimer: "[T]his inspection is not warranted in any way. This has been a visual walking through inspection."
Gvozdanovic and Niehaus met with representatives of Hydra-Lift and two other similar companies to assess their conclusions about what they could do to correct the structural problems with the house. None of the representatives they met with, including Humphries, were structural or geotechnical engineers.
At some point, Gvozdanovic informed Hermes that he had a partner to be involved in the purchase of the property, and Hermes accompanied both defendants on a visit to the property. Hermes testified that he used the word "landslide" in describing the problems on the property to Niehaus.
On June 28, 1994, Gvozdanovic and Niehaus signed a new contract to purchase 638 Fleming Rd. and an adjoining property for $125,000. Niehaus did not ask for a disclosure form documenting the landslide condition. The pair provided $10,000 in earnest money, $9,500 from Niehaus and $500 from Gvozdanovic. After obtaining a joint bank loan for $150,000, Niehaus and Gvozdanovic closed on the real-estate transaction with Kraft Construction. Although Niehaus took title to the property as "trustee" without a trust agreement,[2] the defendants testified at trial that each held an interest in the property and that they shared equally in all profits and expenses associated with repairing and selling the property. While Niehaus contributed more money to complete the renovation, Gvozdanovic contributed more time, labor, and equipment.
After the closing, the defendants made repairs and improvements to the property. Hydra-Lift installed eleven piers and lifted the foundation. Drains were installed along the property's retaining wall. Contractors were hired to perform extensive cosmetic work, including repairing the driveway and cracked drywall, painting, wallpapering, and landscaping. In total, defendants spent $37,000 to improve the property and to repair the visible structural damage.
Defendants listed the property for sale in late 1994 with an asking price of $224,000. Niehaus marketed the property for sale with Re/MAX as the listing broker and herself as the owner and selling agent of the property. The defendants discussed between themselves how to respond to the questions listed on the Ohio Residential Property Disclosure Form. Niehaus ultimately handwrote on the form that a "[c]orner of the foundation settled. Portion of detached garage settled. Both conditions were corrected by Hydra-Lift." She also wrote that "French drains were installed on the west side of house. Drains were installed in driveway. Drainage and weep holes were installed in retaining walls and stone walls where necessary." Niehaus failed to mention the landslide condition and that the work performed would not prevent settling due to lateral movement of the land.
Allen first visited the property with his realtor in January 1995. At the time, the driveway was removed, but no other work was being performed on the property. During his second visit to the property, Allen met with Niehaus and Gvozdanovic, who took him and his realtor on a tour of the interior and the exterior of the property. When Allen questioned defendants about the work performed on the property and why the driveway had been removed, they told him only that the house had settled as a result of inadequate drainage, and that both the settlement and inadequate drainage had been remedied. Niehaus gave him a brochure on the Hydra-Lift process that explained how the house had been jacked up and placed on piers. At no point did Niehaus or Gvozdanovic mention the landslide condition. Allen chose not to have the home inspected, relying instead on Niehaus's and Gvozdanovic's representations that the structural defects and the underlying causes had been fixed.
On the third visit, Allen tendered an offer for the home and eventually negotiated a purchase price of $201,854.66 including taxes and closing costs. Defendants made a turn-around profit of $73,054.
Allen and his family moved into the house during the spring of 1995, and by the spring of 1996 the signs of a landslide began reappearing. The asphalt on the driveway began buckling and pulling away from the house. The following spring, the deck detached from the house and the walls inside the house began to warp as drywall nails popped out. Due to the possibility that the landslide would continue to move, making the property unsafe, in 1999, Allen was instructed by Donald Thelen, a geotechnical engineer and the author of the Thelen report, to vacate the property. Michael Viola, an appraiser, testified for Allen at trial that the property in its current condition had no market value. He stated that, upon weighing the costs and risks associated with the property, "you're better off not to own it than to own it."
 THE LAWSUIT AND TRIAL
After learning that a landslide condition existed on the property that he had purchased, Allen sued Niehaus and Gvozdanovic, individually and as partners,[3] alleging that they had fraudulently or negligently concealed and/or misrepresented the landslide condition and the structural integrity of the house. At trial, the court granted Niehaus's and Gvozdanovic's motion for a directed verdict on the negligent-misrepresentation claims, but allowed the fraud claims to go to the jury. After hearing five days of testimony, the jury concluded that Niehaus and Gvozdanovic had created a partnership and that the partnership was legally responsible to Allen for fraud. The jury awarded Allen $201,854.66 in compensatory damages jointly and severally against the defendants, as well as $200,000 in punitive damages against each defendant. The jury also awarded Allen attorney fees jointly and severally against the defendants in an amount to be determined by the trial court. On December 1, 1999, the trial court entered judgment on the jury's verdict and, after an evidentiary hearing on Allen's application for attorney fees, awarded Allen an additional $136,817.
On February 22, 2000, Gvozdanovic, who is not a party to this appeal, and Allen entered into a settlement agreement under which Gvozdanovic paid Allen $240,000. The settlement agreement, attached to Allen's notice of satisfaction of judgment as to Gvozdanovic filed in the trial court, specified that $190,000 "shall be credited to the verdict for compensatory damages * * * and the balance to the award of attorney fees." Based on this, Niehaus sought to offset the amount of compensatory damages that Allen could collect from her by the full $240,000. Over Allen's objections, the trial court agreed to a setoff, but not by the full $240,000. Instead, the court reduced the joint-and-several portion of the judgment against Niehaus by half, in the amount of $170,807.21.
Allen then moved for an award of prejudgment interest under R.C.1343.03(C), which the trial court granted in the amount of $49,164.05. The court overruled Niehaus's motions for judgment notwithstanding the verdict, a new trial, and remittitur.
 THE ASSIGNMENTS OF ERROR
Niehaus raises seven assignments of error in her appeal. As many of these alleged errors require the application of partnership law, we begin our analysis with a review of the pertinent partnership law of Ohio.
In 1949, the General Assembly adopted the Uniform Partnership Act (1914), now codified in R.C. Chapter 1775, The Uniform Partnership Law. R.C. 1775.05 provides that "[a] partnership is an association of two or more persons to carry on as co-owners a business for profit * * *." In general, every partner is an agent of the partnership for purposes of its business, and as a result the act of every partner for apparently carrying on in the usual way the business of the partnership binds the partnership. R.C. 1775.08. This characteristic of a partnership requires a factual finding that the participants in a business venture have expressly or impliedly authorized the other participants to act on behalf of the partnership. A community of interest in the profits of a business or a transaction is cogent evidence of this relation or implied authority. R.C. 1775.06(D); Harvey v. Childs (1876), 28 Ohio St. 319,321. A partnership differs from a joint venture in that it is entered into for more than a single transaction or a limited period of time.Nilavar v. Osborn (1998), 127 Ohio App.3d 1, 20, 711 N.E.2d 726, 738.
Finally, under Ohio law, the partnership and each individual partner are responsible to third persons for the wrongful acts of any partner committed in the ordinary course of partnership business. See R.C. 1775.08. This liability, under the agency principal of respondeat superior, attaches even where a partner commits fraud, as long as the fraud is committed in the ordinary course of the partnership business or is authorized by the other partners. See R.C. 1775.08(B); Vrabel v. Acri
(1952), 156 Ohio St. 467, 472, 103 N.E.2d 564, 567; Barensfeld v. PetrieSmith (Aug. 12, 1998), Medina App. No. 2677-M, unreported, fn. 5. Each partner is rendered "jointly and severally" responsible for tortious acts chargeable to the partnership under R.C. 1775.12, meaning that a plaintiff can obtain satisfaction of an entire judgment against the partnership from any one partner (several liability), and the partner's personal assets are available to satisfy the tort judgment (joint liability). R.C. 1775.14(A)(1).
In Niehaus's third assignment of error, which we address first, she argues that the trial court erred in denying her motions for a directed verdict and for judgment notwithstanding the verdict ("JNOV") on Allen's claims arising from an alleged partnership. We disagree.
In reviewing the trial court's denial of Niehaus's motions for a directed verdict and for JNOV, this court must construe the evidence most strongly in favor Allen and determine whether a reasonable jury could have found the existence of a partnership. Civ.R. 50(A)(4) and (B). A motion for a directed verdict or JNOV must be denied when substantial, competent evidence has been presented from which reasonable minds could draw different conclusions. "While the same standard is used to resolve both types of motions, a directed verdict motion made at the close of plaintiff's evidence is evaluated on the evidence in the plaintiff's case in chief, * * * while a JNOV motion is evaluated on all the evidence presented at trial." Chemical Bank of New York v. Neman (1990),52 Ohio St.3d 204, 207, 556 N.E.2d 490, 493 (internal citation omitted).
We first review the evidence present during Allen's case in chief. Allen presented evidence that Niehaus and Gvozdanovic had an ongoing, eight-year business relationship that began in 1988, pursuant to which they purchased property, renovated it, and resold it for a profit. The defendants always shared equally in the profits from the resale of properties they purchased, including the $73,000 profit they made on the sale of 638 Fleming Road to Allen. This evidence, alone, was sufficient to defeat Niehaus's motion for a directed verdict. R.C. 1775.06(D).
Further, Allen presented evidence that both defendants made management decisions related to the business venture — they jointly decided which properties to purchase, what improvements to make to the properties they purchased, and the sale price for the properties they purchased.
Significantly, six months after they sold Allen 638 Fleming Road, Niehaus and Gvozdonovic entered into a hold-harmless agreement setting forth their prior business relationship as to the eleven properties they had purchased in the past, including the property at 638 Fleming Road. The agreement stated in pertinent part the following:
 The parties agree that for each property set forth in Exhibit "A" that they shall equally contribute to all costs of acquisition, improvement, renovation, repair, remodeling, ownership, maintenance, cost of funds borrowed (including interest), and expenses of sale. The parties further agree that upon such sale of any property the parties shall equally divide the net proceeds after first fully paying all the aforedescribed expenses.
 The parties agree that as of December 20, 1995, the parties have equally shared and divided all costs, expenses and profits * * *.
Undoubtedly, Allen presented sufficient competent evidence for the jury to infer that Niehaus and Gvozdanovic had shared net profits as principals in a continuing business, in which each had the express or implied authority to bind the other. For this reason, the evidence supported a finding of a partnership. See Simandl v. Schimandle (1982),3 Ohio App.3d 357, 445 N.E.2d 734. For this reason, the trial court did not err in denying Niehaus's motion for a directed verdict on the partnership claims.
Niehaus attempted to rebut this evidence of a partnership by testifying that she never gave Gvozdanovic the authority to act on her behalf and that she did not have any authority to act for him. Despite this testimony, the evidence at trial showed that Niehaus acted for herself and as an agent for Gvozdanovic. She signed several documents that were binding on herself and Gvozdanovic. These documents included the deed transferring the property to Allen and the residential disclosure form. Additionally, there was much evidence from which to infer that Gvozdanovic, who was primarily involved in the rehabilitation of the property, made decisions concerning the project that were binding on Niehaus. Gvozdanovic's responsibilities included meeting with contractors and subcontractors on a daily basis at the property. Presumably he made decisions and purchases that were binding on Niehaus. Payment for these day-to-day expenses came from a joint escrow account.
Finally, Niehaus argues that the defendants never intended to create a partnership. This argument is not persuasive in light of the facts of this case. The law creates a partnership when the parties have acted in such a way that a partnership has come into operation. The relevant inquiry is not whether the parties intend that the law describe their relationship as a partnership, but rather whether they intend a relationship that includes the essential elements of partnership. See The Law of Agency and Partnership (3 Ed. 2001), Chapter 1, Section 3.
After considering all the evidence presented in the case, we hold that the evidence supported a finding of a partnership. Therefore, the trial court did not err in denying Niehaus's motions for a directed verdict and for JNOV on the partnership claims. Accordingly, the third assignment of error is overruled.
In her first assignment of error, Niehaus attacks the trial court's jury instructions on the rules for determining the existence of a partnership and a joint venture. She argues that the court erred in refusing to instruct the jury that the "joint purchase of real estate for resale does not in itself establish a partnership `whether such co-owners do or do not share any profits made by the use of the property' or share in the gross returns"[4]
R.C. 1775.06 provides guidelines in determining the existence of a partnership. These guidelines, in relevant part, are as follows:
 (B) Joint tenancy, tenancy with a right of survivorship, tenancy in common, tenancy by the entireties, joint property, common property, or part ownership does not of itself establish a partnership, whether such co-owners do or do not share any profits made by the use of the property.
 (C) The sharing of gross returns does not of itself establish a partnership, whether or not the persons sharing them have a joint or common right or interest in any property from which the returns are derived.
 (D) The receipt of a person of a share of the profits of a business is prima-facie evidence that he is a partner in the business * * *.
In its instruction to the jury, the court did not read the specific language of R.C. 1775.06, but instead instructed the jury as follows:
 Partnership. A partnership is an association of two or more persons to carry on as co-owners of a business for profit. Participation in the profits of a business is strong evidence of a partnership. However, the persons making the profits must take those profits as principals in a joint business in which each person has the express or implied authority to bind the other.
 The trial court need not give a party's requested jury instruction in its precise language even if the proposed instruction states an applicable rule of law. Instead, the court has the discretion to use its own language to communicate the same legal principles. Henderson v. Spring Run Allotment
(1994), 99 Ohio App.3d 633, 638, 651 N.E.2d 489, 492-493; Youssef v. Parr, Inc. (1990), 69 Ohio App.3d 679, 690, 591 N.E.2d 762, 769. Moreover, if the court's instruction correctly states the law pertinent to the issues raised in the case, the court's use of that instruction will not constitute error, even if the instruction is not a full and comprehensive statement of the general body of law. Atkinson v. Intl. Technegroup, Inc. (1995), 106 Ohio App.3d 349, 365, 666 N.E.2d 257; 268; Henderson, supra. Here, the court's instruction on determining the existence of a partnership was a correct statement of the law. See Harvey v. Childs (1876), 28 Ohio St. 319, paragraph two of the syllabus; Berger v. Dare (1994), 99 Ohio App.3d 103, 649 N.E.2d 1316. While not as specifically tailored to the facts of the case as the instruction proposed by Niehaus, the instruction correctly stated the law pertinent to the issues in the case and did not constitute error. The instruction sufficiently informed the jury that no matter what type of business the participants were involved in, there could not be a partnership unless each participant had the express or implied authority to bind the partnership. The trial court did not err in declining to give Niehaus's proposed instruction on this issue.
Niehaus argues also that the court's instructions on a joint venture or enterprise were erroneous. We disagree[5] and add that any error was not objected to below. "On appeal, a party may not assign as error the giving or failure to give any instruction unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection. Civ.R. 51(A). Further, any error could not have been prejudicial to Niehaus because the jury did not find that Niehaus and Allen had formed a joint venture or enterprise, but rather a partnership. Accordingly, the first assignment of error is overruled.
In her second assignment of error, Niehaus argues the trial court erred in refusing to instruct the jury in accordance with R.C. 1775.11. This code section provides as follows:
 Notice to any partner of any matter relating to partnership affairs, and the knowledge of the partner acting in the particular matter, acquired while a partner or then present to his mind, and the knowledge of any other partner who reasonably could and should have communicated it to the acting partner, operate as notice to or knowledge of the partnership, except in the case of a fraud on the partnership committed by or with the consent of that partner.
 We overrule this assignment of error for three reasons. First, in order to preserve error for appeal, a request for a specific instruction must be in writing, and any objection to an instruction must be specific. See Civ.R. 51(A); Wagner v. Galipo
(1994), 97 Ohio App.3d 302, 312, 646 N.E.2d 844, 850. Our review of the record reveals that Niehaus never submitted a written request for an instruction on R.C. 1775.11, nor did she specifically object to the partnership instructions on that ground. The relevant text of Niehaus's counsel's objection before the trial court reads as follows:
 I, too, of course, have a little problem with Jury Instruction Number 13 when we're talking about partnership and there is no instruction included with regard to how a partnership is affected by co-ownership in real property. There is nothing in here that talks about that and the limitations imposed by the Ohio Revised Code.
 We hold that Niehaus's oral reference to "limitations imposed by the Ohio Revised Code" was not a request for an instruction on R.C. 1775.11 and was insufficient to preserve any error for purposes of appeal.
Second, the requested instruction must be a correct statement of the law. See Civ.R. 51(A); Murphy v. Carollton Mfg. Co., (1991),61 Ohio St.3d 585, 591, 575 N.E.2d 828, 832; Wagner, supra. The instruction Niehaus cites on appeal is an incorrect statement of the law. Her instruction provides that "notice or knowledge obtained prior to the formation of the joint venture or partnership cannot be imputed to partners." In support of this instruction, she cites Moore v. Daw (Aug. 20, 1996), Muskingum App. No. 95-20, unreported.
We interpret R.C. 1775.11 as meaning that when the partner acting in the particular matter acquired knowledge before he became a partner, and the knowledge is then present in his mind, the knowledge will be imputed to the partnership, except when the partner is perpetrating a fraud upon the partnership. See Uniform Partnership Act (1914), Comment to Section 12. We distinguish Daw on the grounds that the partner with knowledge inDaw was not the acting partner. In this case, Gvozdonovic was one of the acting partners. He made oral misrepresentations to Allen and actively concealed evidence of the landslide.
Third, the requested instruction must be applicable to the facts of the case, and it must be within the realm of reasonable minds to reach the conclusion sought by the instruction. See Civ.R. 51(A); Murphy, supra;Wagner, supra. Since Gvozdanovic was an acting partner, a R.C. 1775.11
instruction was necessary only if there was evidence that Gvozdanovic defrauded the partnership. But Niehaus did not present any evidence or argument below indicating that Gvozdonovic had perpetrated a fraud upon her. The evidence indicated that Niehaus knew of the landslide condition. Both Hermes and Gvozdonovic testified that they had discussed with her the landslide condition identified on the property disclosure form. Niehaus testified otherwise at trial, but plaintiff's counsel impeached that testimony with deposition testimony in which Niehaus admitted that the defect had been described to her as a "landslide." Further, her cement contractor notified Niehaus that the property had structural damage that he could not explain, yet she never sought the advice of an engineer as to the cause of this damage. Finally, while Niehaus did not receive a copy of the disclosure form from Kraft Construction documenting the landslide condition, she testified that, as a seasoned real-estate agent, she knew that she was entitled to a copy of the form.
For these reasons, we find no error, and the second assignment of error is overruled.
Niehaus's fourth assignment of error concerns Allen's 1998 refinancing application excluded by trial court. On the application, Allen had valued the house at $250,000, but at trial Allen testified that the house was worthless. Also, Allen had indicated on the application that he was not involved in any litigation at the time, even though this lawsuit had been filed.
Niehaus argues that the court's exclusion of the refinancing application and related testimony prejudiced her in two ways. First, the jury was prevented from considering that Allen had no damages from the defendants' alleged fraud, and, second, she was not allowed to impeach the credibility of Allen.
Although Allen's valuation of the house at $250,000 in the refinancing application was an admission by a party opponent under Evid.R. 801(D)(2), and therefore not considered hearsay, the valuation also constituted lay opinion testimony. The trial court is vested with considerable discretion in determining whether the jury will be aided by lay opinion testimony.
In Ohio, an owner of real estate is permitted to testify as to the value of his property without being qualified as an expert if the trial court finds the testimony rationally based on the perception of the witness and helpful to a clear understanding of his testimony or the determination of a fact in issue. See Evid.R. 701; Tokles Son, Inc. v.Midwestern Indemn. Co. (1992), 65 Ohio St.3d 621, 605 N.E.2d 936, paragraph two of the syllabus, overruled sub silento in part on other grounds to the extent inconsistent with Zoppo v. Homestead Ins. Co. (1994), 71 Ohio St.3d 552, 644 N.E.2d 397; Smith v. Padgett (1987),32 Ohio St.3d 344, 347, 513 N.E.2d 737, 740.
The court did allow Allen to testify at trial as to the value of the house, but this testimony was presented after his expert witness, Donald Thelen, a geotechnical engineer and author of the Thelen report, testified that after re-visiting the house on March 29, 1999, he recommended that the house be vacated by December 1999. Allen's valuation on the 1998 refinancing application did not take into consideration this important fact. Therefore, we hold that the court did not abuse its discretion in excluding Allen's 1998 valuation of the house as substantive evidence. Under the same rationale, the court properly restricted the 1998 valuation for impeachment purposes.
Finally, under the totality of the circumstances, we are unable to say that the trial court abused its discretion in prohibiting cross-examination of Allen based upon his incorrect response on the application concerning the pendency of this lawsuit. The ability of trial counsel to discredit a witness through cross-examination concerning particular conduct of the witness is not absolute, but limited by the court's sound discretion in determining if the inquiry will lead to particular instances of conduct that are clearly probative of untruthfulness. Evid.R. 608(B) reads, in pertinent part, as follows:
 Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness's character for truthfulness, other than conviction of crime as provided in Evid.R. 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if clearly probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness's character for truthfulness or untruthfulness * * *. [Emphasis added.]
 The "clearly probative" language is a safeguard against the abuse of prior bad acts in cross-examination leading to unfair prejudice, confusion of the issues, and misleading of the jury. State v. Williams (1981), 1 Ohio App.3d 156, 157, 440 N.E.2d 65, 67. In this case, the proffered testimony concerned Allen's response on a refinancing application filled out over a year before trial. His response did not affect the defendants' fraud and may well have led to confusion of the issues by the jury.
Additionally, any error by the trial court in excluding the refinancing application or restricting cross-examination on Allen's responses on the application was harmless in light of the facts of this case. Error in the exclusion of evidence is not grounds for reversal "where the error does not affect substantial rights of the complaining party, or the court's action is not inconsistent with substantial justice." O'Brien v. Angley
(1980), 63 Ohio St.2d 159, 164, 407 N.E.2d 490, 494. In determining whether substantial justice has been done so as to prevent reversal of a judgment for errors occurring at trial, a reviewing court must weigh the prejudicial effect of those errors and determine whether the trier of fact would have probably reached the same conclusion had the errors not occurred. Id. at 165, 407 N.E.2d at 494. Without an outcome-determinative effect, the errors are deemed harmless. Civ.R. 61.
Allen valued the house at $250,000 for purposes of a mortgage and without knowledge that the house had to be vacated. Allen's experts testified that the house was no longer habitable and had no market value. Neither defendant presented expert testimony to challenge this testimony. Instead, the defendants emphasized that they had paid $95,000 for 638 Fleming and the adjoining property in 1995. Niehaus's argument that the jury may have found no damages based upon the excluded loan application is tenuous as best.
Further, in coming to a determination on the other two major issues in the case, whether Niehaus and Gvodzonovic created a partnership and whether they knowingly or recklessly misrepresented the condition of the house to Allen, the jury did not need to weigh the credibility of Allen's testimony. Therefore, Niehaus's claim of prejudice based upon the court's exclusion of the refinancing application and the court's limitation of Niehaus's impeachment of Allen based upon his declarations in the application is unsubstantiated by the record. Accordingly, the fourth assignment of error is overruled.
In her fifth assignment of error, Niehaus submits that trial court erred by failing to vacate or reduce the $200,000 award of punitive damages and the award of attorney fees. She argues that the punitive-damage award was excessive and unconstitutional because it amounted to over 50% of her net worth, and because her liability for the punitive damages was merely imputed to her by virtue of a partnership with Gvozdonovic. Niehaus does not challenge the evidence as insufficient to support a finding of fraud[6] or insufficient to justify an award of punitive damages.
At the outset, we clarify an ambiguity in the record concerning the punitive-damage award. While the jury filled out separate verdict forms for punitive damages against each defendant, compensatory damages were levied against the partnership, and, therefore, the partnership was responsible for the punitive damages.[7] Further, we assume, as the parties do, that $200,000 was the amount in controversy concerning the punitive damages.
In Ohio, punitive damages are awarded not to compensate a plaintiff, but to punish and deter certain conduct. See Moskovitz v. Mt. Sinai Med.Ctr. (1994), 69 Ohio St.3d 638, 651, 635 N.E.2d 331, 343. But the Ohio legislature's discretion to punish is substantively limited by the Fourteenth Amendment's Due Process Clause, which makes the Eighth Amendment's prohibition against excessive fines and cruel and unusual punishments applicable to the states, and, by its own force, prohibits states from imposing grossly excessive punishments on tortfeasors. CooperIndustries, Inc. v. Leatherman Tool Group, Inc. (2001), 532 U.S. 424, ___, 121 S.Ct. 1678, 1684. Our review of the
constitutionality of the award is de novo.[8] Cooper, supra at ___, S.Ct. 1685-1686.
In BMW of North America, Inc. v. Gore (1996), 517 U.S. 559,116 S.Ct. 1589, the United States Supreme Court set forth three guideposts to determine whether an award of punitive damages is so excessive as to violate a defendant's due-process rights: (1) the degree of the defendant's reprehensibility or culpability; (2) the relationship between the penalty and the harm to the victim caused by the defendant's actions; and (3) "the difference between this remedy and the civil penalties authorized or imposed in comparable cases." Id. at 575,116 S.Ct. at 1598-1599.
We begin our analysis by examining the degree of reprehensibility of the partnership's conduct in this case. In examining the degree of reprehensibility of a defendant's conduct, the Supreme Court in BMW
outlined a number of "aggravating factors," including whether the harm was more than "purely economic in nature," and whether the defendant's behavior "evinced * * * indifference to or reckless disregard for the health and safety of others." Id. at 576, 116 S.Ct. at 1599. Here, the harm to Allen was mainly economic, but the partnership's fraudulent concealment of the landslide condition also exhibited a callous indifference to the safety of the Allen family. The house on the property is now uninhabitable because it is in danger of collapsing. Undoubtedly, serious injury or death could have resulted had the house collapsed while inhabited. We are persuaded that this callous indifference to the safety and economic well-being of Allen and his family evinced a degree of reprehensibility sufficient to support a $200,000 punitive-damage award.
The next factor we consider is the ratio between the punitive-damage award and the actual harm inflicted on the plaintiff. There must be a reasonable relationship between the punitive-damage award and the harm likely to result from the defendant's conduct as well as the harm that has actually occurred. Id. at 581, 116 S.Ct. at 1602. The jury measured compensatory damages at $201,866. If the house had actually collapsed with the Allen family inside, the harm would have been much greater and could have resulted in the loss of life. The punitive-damage award was less than one times the compensatory award. Although no set ratio appropriately demarcates the constitutionality of an award, in light of the steep actual damages and the life-threatening potential damages in this case, we hold that the $200,000 punitive-damage award was reasonably related to the award of compensatory damages. See Pacific Mut. Life Ins.Co. v. Haslip (1991), 499 U.S. 1, 111 S.Ct. 1032 (upholding punitive-damage award against an insurer whose agent defrauded an insured where award was four times the amount of compensatory damages).
Finally, "comparing the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct provides a third indicium of excessiveness." BMW at 583,116 S.Ct at 1603. If prosecuted criminally, the acts of the partnership could have resulted in a criminal charge of theft by deception, a third-degree felony. R.C. 2923.02. If convicted, the partnership could have been fined up to $20,000 and ordered to pay restitution to Allen for all economic losses resulting from the partnership's criminal acts. R.C.2929.31(A)(1)(4) and R.C. 2929.18(A)(1). If prosecuted and convicted individually, Niehaus could have been ordered to serve one to five years of imprisonment, ordered to pay restitution to Allen, and fined up to $10,000. See R.C. 2929.14(A)(4) and R.C. 2929.18(A)(1) and (3)(b). We hold that the $200,000 punitive-damage award was reasonable in view of the other sanctions available. See Haslip, 499 U.S. at 23,111 S.Ct. at 1046.
Niehaus also challenges the punitive-damage award and the award of attorney fees on the ground that it will usurp more than 50% of her net worth. While the financial condition of a defendant is a factor to be considered in determining whether an award furthers the state's interest in punishing the guilty party and deterring similar conduct in the future, it is not a definitive factor.[9] See Wagner v. McDaniels
(1984), 9 Ohio St.3d 184, 459 N.E.2d 561, paragraph two of the syllabus (holding that "[e]vidence of a defendant's net worth may be considered by the factfinder in determining appropriate punitive damages, but this evidence is not required before otherwise proper punitive damages may be awarded to a party"). The $200,000 award at issue does not shock the judicial conscience in light of the partnership's outrageous conduct and the state's strong interest in deterring future misconduct by the partnership or by other real estate "investors." Fraudulently concealing hidden defects in residential property in order to sell it for a healthy profit is a tempting proposition. If a buyer discovers the fraud, he must prove the fraud by a heightened standard in order to recover damages. The measure of compensatory damages is limited to the difference between the value of the property as represented and value of the property with the defect. Therefore, a large punitive-damage award is necessary to punish and deter.
Finally, we add that Niehaus's focus on her net worth is misguided, for the partnership assets, if any, must be extinguished before individual partners will become liable for the judgment.
We hold in this case that the award, which is less than the compensatory-damage award, furthers the state's interest in punishing and deterring similar conduct. Therefore, the award passes constitutional muster and the fifth assignment of error is overruled.
Niehaus's sixth assignment of error, and Allen's third assignment of error in his cross-appeal, address the trial court's setoff of the jury's award by monies paid to Allen by Gvozdanovic in a post-judgment settlement agreement. The agreement specified that "of the $240,000 to be paid by Mr. Gvozdanovic * * * the amount of $190,000 shall be credited to the verdict for compensatory damages in the Case and the balance to the award of attorney's fees in the case."
Upon Niehaus's motion for a setoff, the trial court reduced the compensatory-damage award and the attorney fee award by half. Niehaus argues that she was entitled to a setoff of the entire $240,000 under R.C. 2307.33(F). Allen argues that there should not have been a setoff at all because Niehaus was an intentional tortfeasor, and, under Ohio law, a judgment based on an intentional tort may not be reduced by amounts paid in settlement by a joint tortfeasor. See Jones v. VIP Development Co. (1984), 15 Ohio St.3d 90, 97-98, 472 N.E.2d 1046, 1053-54 (superceded in part by statute on other grounds, reinstated in Johnson v. B.P. [1999],85 Ohio St.3d 298, 707 N.E.2d 1107); Klosterman v. Fussner (1994),99 Ohio App.3d 534, 540, 651 N.E.2d 64, 68.
We begin our analysis by rejecting the notion that the jury found Niehaus and Gvozdanovic to be "joint tortfeasors." The jury found Niehaus and Gvozdanovic liable as partners. Hence, the jury's verdict gave rise to a partnership obligation. Both Gvozdanovic and Niehaus are jointly and severally liable for this obligation. R.C. 1775.14(A)(1). Payment of a portion of the partnership obligation reduces the partnership liability. Therefore, the trial court should have reduced the judgment by the full $240,000. Accordingly, Niehaus's sixth assignment of error is sustained, and Allen's third assignment of error in his cross-appeal is overruled.
In her final assignment of error, Niehaus argues that the trial court erred by imposing prejudgment interest on the compensatory-damage award. Niehaus argues that she made a good-faith effort to settle because the partnership's final offer of $215,000 was more than the compensatory damages awarded by the jury. The trial court awarded prejudgment interest from May 1, 1995, to March 1, 2000 at ten percent on one-half of the compensatory-damage award ($100,427.33).
Ohio's prejudgment-interest statute, in pertinent part, reads as follows:
 Interest on a judgment * * * rendered in a civil action based on tortuous conduct and not settled by agreement of the parties, shall be computed from the date the cause of action accrued to the date on which the money is paid * * * if * * * the court determines* * * that the party required to pay the money failed to make a good faith effort to settle the case and the party to whom the money is to be paid did not fail to make a good faith effort to settle the case. R.C. 1343.03(C).
"A party has not `failed to make a good faith effort to settle' under R.C. 1343.03(C) if he has (1) fully cooperated in discovery proceedings, (2) rationally evaluated his risks and potential liability, (3) not attempted to unnecessarily delay any of the proceedings, and (4) made a good faith monetary settlement offer or responded in good faith to an offer from the other party." Kalain v. Smith (1986), 25 Ohio St.3d 157,495 N.E.2d 572, syllabus; Moskovitz v. Mt. Sinai Medical Ctr. (1994),69 Ohio St.3d 638, 658-59, 658 N.E.2d 331, 347-48. "The statute was enacted to promote settlement efforts, to prevent parties who have engaged in tortuous conduct from frivolously delaying the ultimate resolution of the cases, and to encourage good faith efforts to settle controversies outside a trial setting." Kalain at 159,495 N.E.2d at 574. To carry out the purposes of the statute, courts have strictly construed the "good faith, objectively reasonable belief" language ofKalain. Galayda v. Lake Hospital Systems, Inc. (1994), 71 Ohio St.3d 421,429, 644 N.E.2d 298, 303.
"The decision as to whether a party's settlement efforts indicate good faith is generally within the sound discretion of the trial court."Kalain at 159, 495 N.E.2d at 574. The term "abuse of discretion" connotes more than an error of law or of judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable. Huffman v. HairSurgeon, Inc. (1985), 19 Ohio St.3d 83, 87, 482 N.E.2d 1248, 1252.
In determining what constitutes an abuse of discretion in the award of prejudgment interest under R.C. 1343.03(C), the Supreme Court has stated,
 [A]n abuse of discretion involves far more than a difference in * * * opinion * * *. The term discretion itself involves the idea of choice, of an exercise of will, of a determination made between competing considerations. In order to have an "abuse" in reaching such determination, the result must be so palpably and grossly violative of fact and logic that it evidences not the exercise of reason but rather of passion or bias.
Huffman, supra, citing State v. Jenkins (1984), 15 Ohio St.3d 164, 222,473 N.E.2d 264. The record shows that Allen attempted to settle his claims before filing the complaint in this action. Allen, through counsel, sent a letter dated March 3, 1997, to Niehaus's counsel, demanding that the defendants repurchase 638 Fleming Road from Allen and make him whole. No dollar amount was included. The defendants did not respond to the letter, and this lawsuit was filed on May 6, 1997.
The parties apparently met on September 4, 1998, and the defendants expressed an interest in attempting to stabilize the landslide condition through one of the potential remedies set forth in the original Thelen report. After discussing this option with Thelen and learning of the costs and limitations of such a solution, Allen rejected it. Instead, on October 29, 1998, he requested a rescission of the real-estate contract and the defendants' payment of $352,283 to him. This sum included all the monies that he had expended in purchasing the property ($203,000), mortgage interest paid since the purchase of the property minus twenty-eight percent to account for tax benefits ($42,000), real-estate taxes paid since his purchase of the property ($3,900), attorney fees ($16,000), and the monetary equivalent of an increase in value of the property at a rate of four percent per year since his purchase in 1995 ($29,000). Noting that discovery had indicated that Gvozdanovic and Niehaus had knowledge of the landslide and, therefore, that punitive damages were likely, Allen included in the sum an additional $50,000. Six months later, he increased his demand to $450,000 after additional discovery confirmed the likelihood of punitive damages.
On September 24, 1999, five weeks before trial was originally scheduled to begin, the defendants responded with a written offer of $198,000. On October 15, 1999, the joint offer was increased to $210,000.[10] Allen countered with a demand of $310,000. The defendants did not respond to this offer, and the case proceeded to trial. On the first day of trial, the defendants increased the joint offer to $215,000.[11] After the jury rendered its unanimous verdict, Gvozdanovic entered into a settlement agreement with Allen. Gvozdanovic paid Allen $240,000, and, in exchange, Allen recorded a satisfaction of judgment against Gvozdanovic in the case.
Considering the particular and unusual facts of this case, we cannot say that the trial court abused its discretion in determining that the partnership had not made an honest effort to settle the case. We refer to the partnership, and not to Niehaus, because, as stated above, according to the jury's verdict, the partnership was liable to Allen for the damages in this case. Niehaus, as a partner, was jointly and severally liable for the partnership's obligation.
Even though the defendants offered Allen a sum $8000 more than the compensatory-damage award prior to trial, and Gvozdanovic settled a part of the partnership's obligation after trial, the total damage award entered against the partnership equaled $737,000. Further, based upon the facts disclosed in discovery, the risk of a large punitive-damage award was substantial. The trial court did not abuse its discretion in finding that the partnership's offer of $215,000 was not an honest effort to settle the case.
We affirm the trial court's award of prejudgment interest, but order the trial court on remand to recalculate the award in light of our disposition of Niehaus's sixth assignment of error. Accordingly, the seventh assignment of error is overruled.
 ALLEN'S CROSS-APPEAL
Allen has filed a cross-appeal, raising three assignments of error. In his first assignment of error, Allen argues that the trial court erred in not qualifying Craig Roberts, a real-estate broker, as an expert in real-estate disclosure duties. In his second assignment of error, he argues the trial court erred in directing a verdict in favor of the defendants on his negligent-misrepresentation claim. Both assignments of error are rendered moot by our decision to affirm the judgment in favor of Allen on the merits. Allen's third assignment of error, attacking the trial court's award of a setoff to Niehaus, has been overruled in our disposition of Niehaus's sixth assignment of error.
 JUDGMENT
Accordingly, Niehaus's first, second, third, fourth, fifth and seventh assignments of error are overruled. Niehaus's sixth assignment of error is sustained. Allen's first and second assignments of error are rendered moot, and his third assignment of error is overruled.
The judgment of the trial court is affirmed in part and reversed in part, and this cause is remanded for further proceedings to be limited solely to the setoff of liability and the accompanying recalculation of prejudgment interest.
Judgment accordingly.
Hildebrandt, P.J., and Painter, J., concur.
Raymond E. Shannon, retired, from the First Appellate District, sitting by assignment.
[1] The defendants filed a third-party complaint against Kraft Construction that the trial court severed for a separate trial.
[2] At trial, Gvozdanovic explained that Niehaus took title as trustee because he was unable to obtain a release of his estranged wife's dower interest. Niehaus and Gvozdanovic did not enter into any written trust agreement.
[3] Allen also named as a defendant ReMax MKR Partners because of Niehaus's affiliation with the company. The court granted ReMax's motion for a directed verdict at trial, and that order is not challenged in this appeal.
[4] The entire partnership/joint-venture instruction requested by Niehaus reads as follows:
Under Ohio law, shared interest in real property does not in and of itself establish a partnership, whether such co-owners do or do not share any profits made by the use or sale of the property. R.C. 1775.06(B). The sharing of gross returns does not of itself establish a partnership, whether or not the persons sharing them have a joint or common right or interest in any property from which the returns are derived. R.C.1775.06(C). Most importantly, you must determine whether or not Jane Niehaus and Marinko Gvozdanovic were capable of contractually binding each other as a business entity. This means that if one of the Defendants signed a contract, the other would have been bound to perform under the terms of the contract. The true test of partnership, and joint liability, rests on the foundation that the liability is incurred on the express or implied authority to "bind" the other. The mere fact that persons refer to each other casually as "partners" is not conclusive that a partnership exists. The mutual authority to bind one another is the true test. A joint venture is a partnership established for a limited time or limited purpose. In all other respects, it is the same as a partnership.
[5] The court instructed the jury in accordance with 1 Ohio Jury Instructions (2001), Section 15.70, Joint Venture, which refers to the liability incurred by the members of the joint venture in the case of negligence. At the end of the entire jury charge, the court corrected this instruction by informing the jury that negligence should be replaced by "acts".
[6] "Fraud is (a) a representation or, where there is a duty to disclose, a concealment of fact,
(b) which is material to the transaction at hand,
(c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred,
(d) with the intent of misleading another into relying upon it,
(e) justifiable reliance upon the representation or concealment, and
(f) a resulting injury proximately caused by the reliance." Williams v.ITT Financial Services (1998), 83 Ohio St.3d 464, 475, 700 N.E.2d 859,868 (internal quotations and citations omitted).
[7] The jurors were only provided with individual verdict forms for punitive damages. During deliberations, the jury sent a note to the judge stating,
 Should we have a form for punitive damages with both of their names or should we split it and put ½ on each?
 The court responded with the following written instruction:
 You should make your award independently for each defendant and use the individual verdict form.
 None of the parties objected to the court's instruction.
[8] The factual findings of the trial court in conducting the excessiveness inquiry must be accepted unless clearly erroneous. Cooper at ___, 121 S.Ct. at 1685. In this case, the trial court summarily denied Niehaus's motion for a remittitur.
[9] We note that the jury did not hear evidence of the net worth of Niehaus or the partnership. Therefore, Niehaus cannot claim that the award was the result of the jury's passion or prejudice against her after hearing about her financials.
[10] Apparently Gvozdanovic agreed to pay $180,000 of the joint offer and Niehaus agreed to pay the remaining $20,000.
[11] Apparently Niehaus agreed to pay the additional $5,000.