DECISION AND JOURNAL ENTRY
{¶ 1} Appellant, Montrose Toyota, has appealed from a judgment entered by the Summit County Court of Common Pleas awarding Appellee, Craig L. Whitaker, $315,000.00 in damages and $155,056.70 in attorney fees and expenses on his Ohio Consumer Sales Practices Act ("CSPA") claims against Appellant. Appellee has filed a cross-appeal, challenging the trial court's grant of a directed verdict in favor of Appellant on Appellee's fraud claim. We affirm in part, reverse in part, and remand.
 I. {¶ 2} On January 11, 2002, Appellee filed suit against Appellant, alleging claims of fraud, breach of contract, conversion, and violation of the CSPA. Each of the claims arose from the parties' unfruitful efforts to negotiate an automobile lease.
 {¶ 3} The matter proceeded to a jury trial on May 28, 2003. At the close of Appellee's case, the trial court granted a directed verdict in favor of Appellant on Appellee's fraud claim. At the close of all the evidence, Appellee withdrew his breach of contract claim. The jury returned a verdict in favor of Appellee on his two remaining claims, conversion and violation of the CSPA.
 {¶ 4} Appellant timely appealed, raising three assignments of error. Appellee timely cross-appealed, raising one assignment of error.
 II. Assignment of Error No. 1
"The jury's damage award on [appellee's] ohio consumer sales practices act claims was not supported by sufficient evidence and it, along with the trial court's trebling of it, must be reversed."
 {¶ 5} In its first assignment of error, Appellant maintains that Appellee failed to provide evidence sufficient to support the damage award on his CSPA claim.[1] We agree.
 {¶ 6} The CSPA provides a private cause of action, permitting consumers to seek relief against suppliers who have violated the act. R.C. 1345.09. If the violation is an act that has been previously declared deceptive or unconscionable, either by rule adopted by the attorney general or by a decision issued by an Ohio court, the consumer may recover the greater of three times the amount of his actual damages or $200. R.C. 1345.09(B).
 {¶ 7} Because Appellant has challenged the sufficiency of the evidence relating to the damage award, we must determine whether that award is supported by competent, credible evidence. See Chemical Bank of New Yorkv. Neman (1990), 52 Ohio St.3d 204, 207-208.
 {¶ 8} The following particulars of the transaction at issue in this case are undisputed. On October 23, 2001, Appellee went to Appellant's place of business and met with Bob Watterson, one of Appellant's salesmen. Appellee told Watterson that he was interested in purchasing a truck. Watterson showed Appellee a used Dodge truck, and Appellee took it for a test drive. After the test drive, the two men sat down to negotiate the sale and financing of the truck. Watterson calculated the monthly payment on the truck, and Appellee told Watterson that the amount exceeded his budget. Watterson suggested that Appellee consider leasing the truck, which would lower the monthly payment. After Appellee expressed misgivings about the lease due to its mileage restrictions, Watterson assured him that the lease could be written to permit adequate mileage.
 {¶ 9} Watterson ran Appellee's credit report and told Appellee that he thought he would be able to get a lease approved. Appellee said he wanted to inquire about the financing options offered by his credit union before executing the lease, gave Watterson a $200 deposit on the truck, and left the dealership.
 {¶ 10} The next day, Appellee called his credit union and learned that while it did not finance leases on used vehicles, it would finance a lease on a new truck, with a monthly payment of between $240 to $260. Appellee called Appellant's dealership and told Laura Barron, a business manager, that he would not take the used truck he had been interested in since his credit union would not finance a lease on the truck. Barron asked Appellee whether he would be interested in the truck if she could secure a lower monthly payment than that offered by his credit union. Appellee said that he would. Later that same day, Barron called Appellee and told him that she had gotten him approved for a lease on the truck, with a monthly payment of $230. Appellee went to the dealership that evening and agreed to lease the truck.
 {¶ 11} Barron prepared a number of documents relating to the transaction, including a lease agreement, a "spot delivery" agreement, and an application for an extended service contract, and presented them to Appellee for his signature. After signing all of the documents, Appellee left the dealership without the truck. He told Barron that he would return to the dealership to pick up the truck two days later, after selling his old car to an acquaintance.
 {¶ 12} Two days later, Appellee returned to the dealership as promised, to pick up the truck. He gave Barron a check for $1,337, the balance of his $1,537 deposit. Barron gave him a receipt for the $1,337, along with a separate receipt for the $200 he had given to the dealership during his first visit. Appellee then drove away in the truck.
 {¶ 13} That weekend, Appellee had the radio in the truck removed, replacing it with a stereo. The next night, he dropped the truck off at the dealership to have some scratches repaired. He returned one night later, when the repairs were to be completed. Watterson intercepted Appellee at the dealership, told him that there were some additional documents requiring his signature, and introduced him to Michael Weaver, one of Appellant's business managers. Weaver informed Appellee that several banks had refused to finance his lease, but that the dealership had been able to get a bank to agree to finance Appellee's purchase of the vehicle for a monthly payment of $297.
 {¶ 14} Appellee said that he could not afford to pay $297 per month and asserted that he and the dealership had already entered into a lease. Weaver told him that he needed to agree to the purchase deal or the dealership would take back the truck. The two discussed the matter further, and Weaver asked Appellee if he could arrange for someone to co-sign the financing. Appellee said that he thought his father would agree to co-sign the loan.
 {¶ 15} The next day, Appellee's father came to the dealership to co-sign the loan. He noticed that the monthly payment on the document he signed was $240, and recalled that Appellee had told him that his monthly payment would be $230. He informed Appellee of this discrepancy, and Appellee called Barron, who asked him to stop by the dealership. Appellee went to the dealership that evening and met with Weaver. Weaver asked Appellee to sign a new lease agreement with a monthly payment of $240.[2]
Appellee refused to sign, protesting the higher payment and insisting that the dealership had already agreed to a monthly payment of $230. Weaver told Appellee that he had to accept the $240 monthly payment or the dealership would take the truck back. Appellee declined to sign the revised lease and left the dealership without the truck.
 {¶ 16} Appellee later returned the truck's original radio to the dealership and asked the dealership to return the radio he had installed, along with his deposit of $1,537. Appellant claims that Appellee's radio was lost or stolen while it was at the dealership. Additionally, while Appellant admits that it held the deposit long after it should have, it claims that it did so mistakenly. Appellant eventually returned the deposit to Appellee and attempted to deliver a new radio to Appellee.
 {¶ 17} Soon after he returned the truck to Appellant, Appellee ordered a new truck from another dealership. At the time he ordered the truck, he had not yet received his deposit back from Appellant, so Appellee had to borrow money from his parents to use as a down payment on the new truck. The new truck was delivered to Appellee on January 11, 2002, approximately ten weeks after he returned the truck to Appellant. During those ten weeks, Appellee was without a car and relied upon his parents and his friends for transportation.
 {¶ 18} Based upon this sequence of events, the jury found that Appellant had committed eleven distinct violations of the CSPA and awarded Appellee $105,000 for those violations. After finding that each of the eleven violations met the criteria provided by R.C. 1345.09, the trial court trebled the damages set by the jury, raising Appellee's award on his CSPA claim to $315,000. Finally, the trial court awarded Appellee attorney fees in the amount of $155,056.70.
 {¶ 19} Appellee claims that he presented sufficient evidence that he sustained both economic and non-economic damages as a result of Appellant's CSPA violations. As an initial matter, we note that this Court has previously determined that plaintiffs may recover only economic damages under the CSPA. See Marrone v. Phillip Morris, USA, Inc., 9th Dist. No. 03CA0120-M, 2004-Ohio-4874, at ¶ 25. Therefore, any evidence Appellee might have offered relating to non-economic damages cannot support the damage award on his CSPA claim. Accordingly, we review the record only for evidence relating to economic damages.
 {¶ 20} Appellee has offered the following breakdown of the economic damages he claims to have incurred as a result of Appellant's CSPA violations. First, Appellee maintains that he was denied the benefit of the bargain of the lease agreement under its original terms. In a related vein, Appellee contends that he suffered the loss of the use of a vehicle during his ten-week wait for the truck he purchased from a different dealership. Next, Appellee explains that, because Appellant improperly withheld his deposit, he was without funds to cover a deposit on the new truck he ordered and was forced to borrow money from his parents in order to purchase the truck. Finally, Appellee claims that his credit rating was damaged by the multiple credit inquiries Appellant instigated by submitting Appellee's credit application to numerous lenders.
 {¶ 21} After reviewing the record, we find that Appellee did not provide competent, credible evidence supporting an award of economic damages on his CSPA claim.
 {¶ 22} Appellee has asserted that he is entitled to his expectation interest, claiming that he was denied the benefit of his bargain with Appellant. However, Appellee offered no proof suggesting that he was left in a worse financial position than he would have been in had Appellant carried out the lease under its original terms. While Appellee did show that his monthly payment on the new truck he ordered is higher than the monthly payment initially offered by Appellant, Appellee offered no comparison of the values of the two vehicles.
 {¶ 23} Appellee also contends that he offered evidence supporting damages for loss of use. It is undisputed that Appellee was without a vehicle for approximately ten weeks, the period after the collapse of his deal with Appellant and before his new truck was delivered. However, Appellee offered no evidence showing that Appellant's CSPA violations caused the ten-week loss of use period. Specifically, Appellee offered no evidence showing that Appellant's CSPA violations left him unable to procure another vehicle for ten weeks.
 {¶ 24} Appellee did testify that he was unable to pay for the down payment on the new vehicle because Appellant wrongfully withheld his deposit. However, Appellee also testified that he was able to borrow money from his parents to cover the deposit. Appellee offered no evidence that he was obligated to pay his parents interest on this loan or that he suffered any other kind of economic damage as a result of Appellant's failure to return his deposit.
 {¶ 25} Finally, it is undisputed that Appellant prompted multiple inquiries into Appellee's credit report by submitting his credit application to several lenders. At trial, one of Appellant's employees agreed that numerous credit inquiries can lower a credit score. This evidence, on its own, is not sufficient to support a damage award, as it establishes, at most, only the potential for injury. Appellee offered no evidence showing that his credit score actually went down as a result of the inquiries initiated by Appellant. Neither did Appellee offer any evidence that he encountered any difficulty securing credit as a result of the inquiries.
 {¶ 26} Appellant's first assignment of error is sustained. We reverse the judgment of the Summit County Court of Common Pleas awarding actual damages on Appellee's CSPA claim and instruct the trial court to enter judgment on statutory damages pursuant to R.C. 1345.09(B) on remand.
 Assignment of Error No. 2
"The jury's damage award on [appellee's] ohio consumer sales practices act claims was against the manifest weight of the evidence and it, along with the trial court's trebling of it, must be reversed."
 {¶ 27} In its second assignment of error, Appellant maintains that the damage award on Appellee's CSPA claims is against the manifest weight of the evidence, because Appellee failed to mitigate his damages. Given our resolution of Appellant's first assignment of error, the argument raised by its second assignment of error is moot, and we decline to address it. See App.R. 12(A)(1)(c).
 Assignment of Error No. 3
"The trial court's attorney fee award was not supported by sufficient evidence and its entry does not sufficiently set forward the basis for the amount awarded."
 {¶ 28} In its third assignment of error, Appellant presents two arguments challenging the attorney fee award granted to Appellee. First, Appellant maintains that the award was not supported by sufficient evidence. Next, Appellant contends that the trial court failed to clearly set forth the basis for the amount awarded. We agree with the second argument.
 {¶ 29} Consumers who have prevailed in a CSPA action may recover reasonable attorney fees if the supplier has knowingly committed an act or practice in violation of the CSPA. R.C. 1345.09(F)(2). A trial court's award of attorney fees will not be disturbed absent an abuse of discretion. Bittner v. Tri-County Toyota, Inc. (1991), 58 Ohio St.3d 143,146. An abuse of discretion is "more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219.
 {¶ 30} The Ohio Supreme Court has delineated the procedure to be followed by the trial court when determining the attorney fees to be awarded pursuant to R.C. 1345.09(F)(2). Bittner, 58 Ohio St.3d at 145.Bittner provides that "the trial court should first calculate the number of hours reasonably expended on the case times an hourly fee, and then may modify that calculation by application of the factors listed in DR 2-106(B)." Id. Because the trial court's entry awarding attorney fees contains no finding regarding the number of hours reasonably expended on the case, this Court is unable to conduct a meaningful review of the trial court's award. See Crow v. Fred Martin Motor Co., 9th Dist. No. 21128, 2003-Ohio-1293, at ¶¶ 39, 41. Therefore, we must reverse the judgment awarding attorney fees and remand the cause for further proceedings. See id. at ¶ 41. Appellant's third assignment of error is sustained.
 Cross-Assignment of Error
"The trial court erred in directing a verdict in favor of [appellant] on [appellee's] fraud and punitive damages claims."
 {¶ 31} In his cross-assignment of error, Appellee contends that the trial court erred by granting a directed verdict in favor of Appellant on Appellee's fraud claim. We disagree.
 {¶ 32} We review de novo the trial court's grant of a directed verdict. Schafer v. RMS Realty (2000), 138 Ohio App.3d 244, 257. A motion for a directed verdict tests the sufficiency of the evidence, not the weight of the evidence or the credibility of witnesses. Wagner v.Roche Laboratories (1996), 77 Ohio St.3d 116, 119. Where there is substantial evidence upon which reasonable minds may reach different conclusions, the motion must be denied. Posin v. A.B.C. Motor CourtHotel, Inc. (1976), 45 Ohio St.2d 271, 275. However, when the party opposing the motion has failed to produce any evidence on one or more of the essential elements of a claim, a directed verdict is appropriate.Hargrove v. Tanner (1990), 66 Ohio App.3d 693,694.
 {¶ 33} The elements of fraud are:
"(a) a representation * * *,
"(b) which is material to the transaction at hand,
"(c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred,
"(d) with the intent of misleading another into relying upon it,
"(e) justifiable reliance upon the representation or concealment, and
"(f) a resulting injury proximately caused by the reliance." Burr v.Bd. of Cty. Commrs. of Stark Cty. (1986), 23 Ohio St.3d 69, paragraph two of the syllabus.
 {¶ 34} After reviewing the record, we find that Appellee failed to produce evidence showing that Appellant acted with an intent to mislead.
 {¶ 35} In his complaint, Appellee alleged that Appellant made certain false representations and concealed certain facts with the intent to pressure Appellee to agree to a second lease and to lead Appellee to "abandon his rights under Ohio law." Appellee's theory of fraud in this case is as follows.
 {¶ 36} According to Appellee, Appellant has developed a scheme to take advantage of its customers. In the first step of the scheme posited by Appellee, Appellant entices a customer into a contract it does not intend to honor and misrepresents to the customer that financing has already been approved. Appellant then takes a deposit on the vehicle and gives the vehicle to the customer, who develops an emotional attachment to the vehicle and becomes dependent upon it for transportation. After the customer has become invested in the vehicle, Appellant calls the customer into the dealership to sign more documents, and only then informs the customer that financing has not been approved. Finally, Appellant pressures the customer into entering a new agreement on the same vehicle, with terms more profitable to Appellant.
 {¶ 37} Appellee called several of Appellant's prior customers as witnesses at trial in his effort to prove the existence of this scheme. However, as the trial court made clear when it granted the directed verdict, the testimony of those prior customers was admitted only in connection with Appellee's CSPA claim, and was not to be used in connection with Appellee's fraud claim.[3] Without this testimony, the only evidence of the scheme posited by Appellee are the details of his own transaction with Appellant. On its own, this account of a single transaction is insufficient to support Appellant's theory of fraud in general, and the element of intent to mislead in particular. As Appellee offered no other evidence suggesting that Appellant intended to mislead him, we find that the trial court did not err by granting a directed verdict on Appellee's fraud claim.
 {¶ 38} Appellee's cross-assignment of error is overruled.
 III. {¶ 39} Appellant's first and third assignments of error are sustained. Appellant's second assignment of error is moot, and we decline to address it. See App.R. 12(A)(1)(c). Appellee's cross-assignment of error is overruled. The judgment of the Summit County Court of Common Pleas is reversed in part, affirmed in part, and the cause is remanded for further proceedings consistent with this opinion.
Judgment affirmed in part, reversed in part, and cause remanded.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
Costs taxed to both parties equally.
Exceptions.
Carr, P.J. Concurs in Judgment Only
[1] Appellant does not contest the jury's determination that it committed eleven violations of the CSPA.
[2] The new lease agreement also differed from the original in that it did not include a service agreement and provided for a larger fee to be paid to the bank financing the deal. Appellee did not notice these modifications at the time.
[3] Appellant has not challenged this ruling in this appeal.